[L.A. No. 30054. In Bank. Jan. 15, 1975.]

SANTA BARBARA SCHOOL DISTRICT et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY,
Respondent;
C. RAYMOND MULLIN et al., Real Parties in Interest.

[L.A. No. 30086. In Bank. Jan. 15, 1975.]

C. RAYMOND MULLIN et al., Plaintiffs and Respondents, v.
SANTA BARBARA SCHOOL DISTRICT et al., Defendants and
Appellants.

**COUNSEL**

George P. Kading, County Counsel, Robert D. Curiel, Chief Assistant County Counsel, Marvin Levine and Don H. Vickers, Deputy County Counsel, for Petitioners and for Defendants and Appellants.

Michael Lawson, A. L. Wirin, Fred Okrand, Laurence R. Sperber, Nathaniel S. Colley, Primo Ruiz, Fred J. Hiestand, Gene Livingston, Jerome B. Falk, Jr., William F. McCabe, Peter Galiano, Robert A. Stafford, Stafford, Buxbaum & Chackmak, Gervaise Davis III, Walker, Schroeder, Davis & Brehmer and Anthony G. Amsterdam as Amici Curiae on behalf of Petitioners.

Price, Postel & Parma, Gary R. Ricks and Hollister, Brace & Angle for Real Parties in Interest and for Plaintiffs and Respondents.

No appearance for Respondent.

Bagley, Bianchi & Sheeks, William T. Bagley, Robert L. McWhirk, Levy & Van Bourg, Victor J. Van Bourg and Stewart Weinberg as Amici Curiae.

## OPINION

**SULLIVAN, J.**—In this class action brought against two school districts and their common governing board of education, we are called upon to determine the validity of a desegregation plan for elementary schools. Our task also requires us to examine and pass upon the constitutionality of a recent initiative measure enacting certain anti-busing legislation and repealing existing statutes dealing with the prevention and elimination of racial and ethnic imbalance in pupil enrollment. Additionally we must examine the validity of the pertinent statute permitting the board of education in question to be the common governing board of the high school district and the elementary school district here involved. In essence, plaintiffs make two independent but cognate attacks—one against the board's plan and the other against the board itself. We take them up in that order, separately stating the facts proper to each. We first turn our attention to the desegregation plan.

I

Defendant Santa Barbara Board of Education (hereafter Board and referred to as defendant in the singular) is the common governing board of defendants Santa Barbara School District and Santa Barbara High School District. Defendant Norman B. Scharer is the Superintendent of Schools of Santa Barbara (superintendent).

Culminating a period of five years' planning and study aimed at correcting the racial imbalance in elementary schools, the Board on February 3, 1972, resolved "to move immediately toward the total desegregation of all Santa Barbara elementary schools beginning in September 1972." The Board adopted the following four-step procedure to effectuate this resolution: (1) the issuance by February 22, 1972, of a statement of policy on desegregation; (2) the creation of a "Task Force Committee for Desegregation," consisting of 22 members, to develop criteria for the study of proposed desegregation plans and to present such criteria to the Board no later than March 2, 1972; (3) the establishment of an "Education and Integration Study Committee," consisting of more than 100 members, under the chairmanship of the superintendent, to review various plans submitted for carrying out the desegregation-integration policy and to present to the Board, no later than May 4, 1972, two or three alternate plans; and (4) the determination that "[o]n May 18, 1972, this Board of Education will adopt one plan to be implemented as fully as possible in September 1972."

Both committees met numerous times and completed all work on schedule. On March 2, 1972, the Board adopted 12 criteria for guidance in reviewing the proposed desegregation plans. One of the criteria stated that any desegregation plan should "provide for optimum use of and be capable of being implemented within existing facilities."

Nine desegregation plans were received and studied initially by the "Task Force" and thereafter by the larger Education and Integration Study Committee. The latter committee by a vote of 74 to 4 recommended to the Board a specific desegregation plan known as the Hord-Mailes-Christian-Belden Plan, named after the four sponsoring elementary school principals. The committee also approved two alternate plans and prior to May 4, 1972, presented all three to the Board. These three plans, together with the West-Anderson plan not recommended by the committee, were formally presented to the Board at its meeting held on May 4, 1972.

Due to various objections raised by members of the Board in the ensuing discussion at that meeting, the superintendent decided to develop his own plan. On May 16, 1972, just two days prior to the Board meeting scheduled for final adoption of a desegregation plan, the superintendent announced, in an article appearing in the Santa Barbara News Press, that he proposed recommending a new desegregation plan at that meeting. The next day the same newspaper contained a longer article describing the general outlines of the so-called "Administration Plan." That night the plan was discussed at a meeting of the Education and Integration Study Committee. However, there was no time for study or review prior to the Board meeting the following night.

At its meeting on the next night—May 18, 1972—the Board discussed the three plans recommended by the committee, the West-Anderson Plan and the Administration Plan. The last named plan was presented orally because it had not yet been reduced to writing. Despite two petitions signed by 3,000 people requesting a postponement for further study, the Administration Plan was adopted by the Board as orally presented. On June 8, 1972, the plan was summarized in writing and submitted to the State Department of Education for approval.

On June 9, 1972, C. Raymond Mullin and Howard G. Larson, on behalf of themselves and of all other voters, parents and taxpayers similarly situated, commenced the instant action seeking: (1) a writ of mandate to compel a special election of the Board and (2) declaratory

and injunctive relief to prevent the implementation of the allegedly unlawful and inadequate desegregation plan. The complaint contained three causes of action: The first two which we discuss separately (see Part II, *infra*) concerned the validity of the election and composition of the Board; the third cause of action alleged that the adoption of the Administration Plan by the Board was: (1) invalid for failure to give notice as required by the Education Code and (2) an abuse of discretion, in that the Board hurriedly adopted an inadequately studied plan which failed to desegregate all the elementary schools, despite the closing of two elementary schools altogether and the changing of the kindergarten to grade six pattern in two other schools.

Following an eight-day trial, the court filed a memorandum of intended decision. In respect to the third count[1] which attacked the validity of the Administration Plan, the court declared its intention to enjoin implementation of the plan. It rested this contemplated action on two bases. First, the court concluded that the Board had no jurisdiction to close the schools since it had failed to include notice of the proposed closure of two schools in its published agenda as required by section 966 of the Education Code. The court determined that the closure of the schools was such an integral part of the Administration Plan that the whole plan must fall. Secondly, the court concluded that the Board abused its discretion by adopting the Administration Plan requiring the closure of two schools since such closure was not reasonably necessary to the effective desegregation of the elementary schools.

Before findings of fact and conclusions of law, based on the court's memorandum of intended decision were filed, defendants presented to this court a petition invoking our original jurisdiction and seeking a writ of prohibition restraining the trial court from entering judgment in accord with the memorandum of intended decision. We issued an alternative writ of prohibition.[2] On August 28, 1972, plaintiffs petitioned this court to modify the alternative writ so as to omit any stay of the trial court's proposed order enjoining implementation of the plan. Since in issuing the alternative writ, we had determined that the petition had made a prima facie showing that the proposed action of the trial court

[1] The memorandum of intended decision also included a proposed decision on the first two causes of action as well, which is discussed in Part II of this opinion.

[2] As prayed for in the petition, the alternative writ of prohibition was limited in effect to the intended decision on the third cause of action. The trial court thereafter entered judgment on the first two causes of action and defendants appealed. We ordered such appeal transferred from the Court of Appeal to this court so that we could consider it simultaneously with the writ proceeding.

was in excess of its jurisdiction and therefore that its proposed enjoining of the Administration Plan must be prohibited pending our final determination of the issue, we denied the petition for modification.

Subsequently an additional factor was injected into the resolution of the above proceeding with the adoption by the electorate at the general election held on November 7, 1972, of the initiative measure denominated Proposition 21. Section 1 of that proposition added to the Education Code section 1009.6 providing: "No public school student shall, because of his race, creed, or color, be assigned to or be required to attend a particular school." Sections 2 and 3 of Proposition 21 repealed sections 5002 and 5003[3] respectively of the Education Code, which had declared the state policy of eliminating racial imbalance in California schools and had delineated the various factors to be considered in implementing this policy. Section 4 of Proposition 21, repealed the administrative guidelines toward achieving racial balance in the schools adopted by the State Board of Education. (§§ 14020 and 14021 of tit. 5 of the Cal. Admin. Code.)

---

[3]Section 5002 provides: "It is the declared policy of the Legislature that persons or agencies responsible for the establishment of school attendance centers or the assignment of pupils thereto shall prevent and eliminate racial and ethnic imbalance in pupil enrollment. The prevention and elimination of such imbalance shall be given high priority in all decisions relating to school sites, school attendance areas, and school attendance practices."

Section 5003 provides: "(a) In carrying out the policy of Section 5002, consideration shall be given to the following factors:

"(1) A comparison of the numbers and percentages of pupils of each racial and ethnic group in the district with their numbers and percentages in each school and each grade.

"(2) A comparison of the numbers and percentages of pupils of each racial and ethnic group in certain schools with those in other schools in adjacent areas of the district.

"(3) Trends and rates of population change among racial and ethnic groups within the total district, in each school, and in each grade.

"(4) The effects on the racial and ethnic composition of each school and each grade of alternate plans for selecting or enlarging school sites, or for establishing or altering school attendance areas and school attendance practices.

"(b) The governing board of each school district shall periodically, at such time and in such form as the Department of Education shall prescribe, submit statistics sufficient to enable a determination to be made of the numbers and percentages of the various racial and ethnic groups in every public school under the jurisdiction of each such governing board.

"(c) For purposes of Section 5002 and this section, a racial or ethnic imbalance is indicated in a school if the percentage of pupils of one or more racial or ethnic groups differs significantly from the districtwide percentage.

"(d) A district shall study and consider plans which would result in alternative pupil distributions which would remedy such an imbalance upon a finding by the Department of Education that the percentage of pupils of one or more racial or ethnic groups in a school differs significantly from the district-wide percentage. A district undertaking such a study may consider among feasibility factors the following:

"(1) Traditional factors used in site selection, boundary determination, and school

Since the Administration Plan was adopted by the Board pursuant to and in furtherance of the repealed code sections, and since the plan involved the assignment of various ethnic minority students to certain schools in order to create a racial balance among the elementary schools in the district, Proposition 21, if valid, would provide an independent basis to support the trial court's intended invalidation of the Administration Plan. This court has, therefore, allowed various amici curiae to file briefs directed to the question of the validity and constitutionality of Proposition 21.

In 1970 the Legislature had added to the Education Code,[4] section 1009.5 which provided: "No governing board of a school district shall require any student or pupil to be transported for any purpose or for any reason without the written permission of the parent or guardian." This court in *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937 [92 Cal.Rptr. 309, 479 P.2d 669] observed that this section was reasonably susceptible of two interpretations: "The ambiguity of section 1009.5 inheres in the phrase *'require* any student or pupil to be transported.' [Fn. omitted.] (Italics added.) One may 'require' a student to be transported by punishing a refusal or by physically forcing him onto a school bus; in a second sense, one may 'require' a student to be transported by *assigning* him to a school beyond walking distance of his home." (*Id.* at p. 945.) We reasoned that if the section were construed to prohibit assignment of pupils to a school beyond a reasonable walking distance from the pupil's home it would be unconstitutional. Applying the doctrine that where possible a statute will be construed in a manner that would uphold its constitutionality, we accordingly held that "section 1009.5 does no more than prohibit a school district from compelling

organization by grade level.
 "(2) The factors mentioned in subdivision (a) of this section.
 "(3) The high priority established in Section 5002.
 "(4) The effect of such alternative plans on the educational programs in that district.
"In considering such alternative plans the district shall analyze the total educational impact of such plans on the pupils of the district. Reports of such a district study and resulting plans of action, with schedules for implementation, shall be submitted to the Department of Education, for its acceptance or rejection, at such time and in such form as the department shall prescribe. The department shall determine the adequacy of alternative district plans and implementation schedules and shall report its findings as to the adequacy of alternative district plans and implementation schedules to the State Board of Education. A summary report of the findings of the department pursuant to this section shall be submitted to the Legislature each year.
 "(e) The State Board of Education shall adopt rules and regulations to carry out the intent of Section 5002 and this section."
 [4]Hereafter, unless otherwise indicated, all section references are to the Education Code.

students, without parental consent, to use means of transportation furnished by the district." (*Id.* at p. 942.)

Shortly after our decision in *Johnson,* the Legislature passed the Bagley Act adding sections 5002 and 5003 (see fn. 3, *ante*) which directed school districts to "eliminate racial and ethnic imbalance in pupil enrollment" and specified certain factors to be considered in developing plans to achieve racial balance. The proponents of Proposition 21 in their published argument in support of the proposition characterized the Bagley Act as a "forced integration measure . . . which could only be accomplished through forced busing . . . without regard to neighborhood schools or parental consent." They asserted opposition to "mandatory busing for the sole purpose of achieving forced integration" and to "reassign[ing] pupils from their neighborhood schools to achieve racial and ethnic balance." Proposition 21 purported to eliminate this evil by repealing the Bagley Act (§§ 5002 and 5003), as well as the complementary administrative regulations, and by adding section 1009.6 which would prohibit forced integration and mandatory busing by denying the school district's power to assign pupils to schools on the basis of race.

Defendants and various amici curiae urge that Proposition 21 is unconstitutional in its entirety, both insofar as it added section 1009.6 and as it repealed sections 5002 and 5003 along with the administrative guidelines.

We declared in *Johnson* that section 1009.5, if construed to bar assignment of pupils to a school beyond reasonable walking distance "would be unconstitutional if applied to districts manifesting racial segregation, whether de jure or de facto in character." (*San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d at p. 954.) Section 1009.6 which bars the assignment of pupils on the basis of race is unconstitutional in the same manner and for the same reasons set forth by us in *Johnson.* We deem it unnecessary to repeat here at length our rationale in that case; our opinion speaks for itself. We merely outline here its essentials, and underscore our conclusions with reference to subsequent United States Supreme Court cases.

*First:* We emphasized in *Johnson* that "Often the most effective program, and at times the only program, which will eliminate segregated schools requires pupil reassignment and busing. . . . Since the U. S. Supreme Court has held that under the Constitution school boards in *de jure segregated districts* are 'clearly charged with the affirmative duty to

take whatever steps might be necessary' to eliminate segregation 'root and branch,' a statute which would proscribe a principal, and in some cases essential and exclusive step to achieve that end, must obviously violate constitutional requirements." (*San Francisco Unified School Dist. v. Johnson, supra,* 3 Cal.3d 937, 955.) (Italics added.)

Approximately three months after we expressed these views in *Johnson* in dealing with section 1009.5, the United States Supreme Court in *Board of Education* v. *Swann* (1971) 402 U.S. 43 [28 L.Ed.2d 586, 91 S.Ct. 1284] struck down a statute virtually identical with section 1009.6[5] (added to the code in 1972 by Proposition 21) with an unmistakably clear and forceful expression of the same constitutional mandate. "Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid . . . all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate dual school systems. [¶] Similarly, the flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. . . . [¶] We likewise conclude that an absolute prohibition against transportation of students assigned on the basis of race, 'or for the purpose of creating a balance or ratio,' will similarly hamper the ability of local authorities to effectively remedy constitutional violations." (*Id.* at p. 46 [28 L.Ed.2d at p. 589].)

*Second:* We further held in *Johnson* that section 1009.5 was unconstitutional as applied to school districts manifesting de facto as well as de jure racial segregation. Citing a number of decisions of lower federal courts (3 Cal.3d at p. 956, fns. 21-23), we observed that they had not drawn a clear distinction between de facto and de jure segregation and that some of them had defined de facto segregation as "that resulting from residential patterns in a nonracially motivated neighborhood school system." (*Id.* at p. 956, fn. omitted; citing inter alia, *Keyes* v. *School District Number One, Denver, Colorado* (D.Colo. 1970) 313 F.Supp. 61, 73-75; *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* (4th Cir. 1970) 431 F.2d 138, 141; 3 Cal.3d at p. 956, fns. 21 and 22.) We noted the necessary

---

[5]North Carolina General Statutes section 115-176.1 (Supp. 1969) provides in relevant part: "No student shall be assigned or compelled to attend any school on account of race, creed, color or national origin, or for the purpose of creating a balance or ratio of race, religion or national origins. Involuntary bussing of students in contravention of this article is prohibited . . . ."

influence of school board decisions on the racial composition of residential areas.

Canvassing these federal precedents we concluded: "Thus under the current pattern of court decisions, neither school districts nor lower courts can determine with any confidence whether a pattern of school segregation should be classed as de facto or de jure. Consequently, if we held section 1009.5 unconstitutional only as applied to districts of de jure segregation, no school board in California . . . could ascertain whether section 1009.5 could constitutionally apply within its district. Such a holding would, therefore, entail uncertain enforcement of section 1009.5, a confusion which would inhibit and delay school boards in their efforts to bring about full equality of educational opportunity. The *Green* decision [*Green* v. *County School Board* (1968) 391 U.S. 430 (20 L.Ed.2d 716, 88 S.Ct. 1689)] calls for desegregation now; a statute which imports confusion and delay in the uprooting of de jure segregation violates both the rule prohibiting partial enforcement of legislation, when such enforcement entails the danger of vague future application, and the mandate of the Supreme Court of the United States." (*San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d at p. 957.)

■ This reasoning has been substantially buttressed by the recent decision of the United States Supreme Court in *Keyes* v. *School District, No. 1, Denver, Colo.* (1973) 413 U.S. 189 [37 L.Ed.2d 548, 93 S.Ct. 2686]. In *Keyes* the high court defined de jure segregation as "current condition of segregation resulting from intentional state action." (*Id.* at p. 205 [37 L.Ed.2d at pp. 561-562].) As potentially probative of an intentional segregative action on the part of school boards, the court referred to "policies and practices with respect to schoolsite location, school size, school renovations and additions, student-attendance zones, student assignment and transfer options, mobile classroom units, transportation of students, assignment of faculty and staff etc." (*Id.* at pp. 213-214 [37 L.Ed.2d at p. 566].)

The high court further emphasized that segregatory intent on the part of the school board is not limited to actions in the immediate present. "We reject any suggestion that remoteness in time has any relevance to the issue of intent. If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less 'intentional.' " (*Id.* at p. 210 [37 L.Ed.2d at p. 564].) We read this to mean that a school board therefore can ascertain

whether the segregation present in its district is de jure or de facto only by examining the full history of acts by the school authorities and determining if, at any time in that course of action, some acts were undertaken with segregatory intent. We think it is clear that no school board or lower court can ascertain with any degree of confidence whether section 1009.6 can constitutionally apply in its district and we further believe that therefore a determination by this court that section 1009.6 can apply to districts manifesting de facto segregation would involve uncertain enforcement and improperly delay elimination of de jure segregation.

The Supreme Court has continuously reiterated its commitment to eliminating de jure racial segregation and its unwillingness to accept any limitation upon procedures necessary to the resolute and thorough accomplishment of that task. To allow school authorities to rest content in the assumption that the pattern of segregation in their district is de facto and therefore to claim that section 1009.6 prohibits them from eliminating that segregation by pupil assignment on the basis of race implemented through busing, would impermissibly impede the constitutionally mandated task of rooting out de jure segregation. "[I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." (*Board of Education* v. *Swann, supra,* 402 U.S. at p. 45 [28 L.Ed.2d at p. 589].)

The high court has also recognized the discouraging fact of the "dilatory tactics of many school authorities"; the "failure of local authorities to meet their constitutional obligations [has] aggravated the massive problem of converting from the state-enforced discrimination of racially separate school[s]." (*Swann* v. *Board of Education* (1971) 402 U.S. 1, 14 [28 L.Ed.2d 554, 565, 91 S.Ct. 1267].) In view of this history, it is all too clear to us that the elimination of de jure segregation would be seriously impeded if school authorities could claim a legal disability to assign or bus pupils merely by asserting that the segregation in their district was de facto in origin.

Consistently with our earlier holding in *Johnson* and indeed under the compulsion of the decisions of the United States Supreme Court in *Swann* and *Keyes* which confirm our views in *Johnson,* we hold, as

indeed we must, that section 1009.6 as applied to school districts manifesting either de jure or de facto segregation is unconstitutional.

We proceed to consider a related issue. It will be recalled that Proposition 21 not only added section 1009.6 but also repealed sections 5002 and 5003 as well as certain administrative guidelines. (See fn. 3, ante.) Various amici curiae urge that the repealing provisions of Proposition 21 (i.e., §§ 2, 3 and 4) are also unconstitutional, on two grounds: (1) the repeal of these sections significantly encourages and involves the state in racial discrimination and (2) even if constitutional in themselves, the repealing provisions are tainted by the unconstitutional portion of Proposition 21 and cannot be severed from it.

On the first point amici argue that our holding in *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825] compels the conclusion that the repealing provisions are themselves unconstitutional. In *Mulkey* we held unconstitutional as violative of the equal protection clause of the Fourteenth Amendment of the United States Constitution, article I, section 26 of the California Constitution, an initiative measure appearing as Proposition 14 on the statewide ballot in the general election of 1964 and adopted by the electorate. That proposition nullified state statutes aimed at eliminating racial discrimination in housing and barred the state from legislating in the future so as to limit the right of private discrimination in the sale or leasing of property. We there focused on the distinction between racial discrimination resulting from state action and that resulting from the private acts of individuals, framing the issue before us thusly: "The only real question . . . is whether the discrimination results solely from the claimed private action or instead results at least in part from state action which is sufficiently involved to bring the matter within the proscription of the Fourteenth Amendment." (*Mulkey* v. *Reitman, supra,* 64 Cal.2d at p. 536.) Finding the requisite state action, we concluded: "Here the state has affirmatively acted to change its existing laws from a situation wherein the discrimination practiced was legally restricted to one wherein it is encouraged . . . . Certainly the act of which complaint is made is as much, if not more, the legislative action which authorized private discrimination as it is the final, private act of discrimination itself. . . . When the electorate assumes to exercise the lawmaking function, then the electorate is as much a state agency as any of its elected officials." (*Id.* at p. 542.) Amici contend that the repealing portions of Proposition 21 (i.e., §§ 2, 3 and 4) similarly were intended to, and will result in, preserving racial discrimination and

segregation, in this instance in the school systems, and thus that the very passage of Proposition 21 involves the state in racial discrimination.

However, *Mulkey* is actually of no assistance to the amici's argument. The mere fact that the initiative measures in both instances—Proposition 14 in *Mulkey* and Proposition 21 in the case at bench—represent state action proves nothing, since in the instant case, the state, *independent of the passage of Proposition 21,* is involved in education. Indeed in *Mulkey* we noted this critical difference: "[I]n *Jackson* v. *Pasadena City School Dist.,* . . . the state, because it had undertaken through school districts to provide educational facilities to the youth of the state, was required to do so in a manner which avoided segregation and unreasonable racial imbalance in its schools." (*Mulkey* v. *Reitman, supra,* 64 Cal.2d at p. 537.) Proposition 21 by repealing the involvement of the state government in discharging the state's duty not to segregate, neither abrogated the school district's constitutional duty not to segregate nor removed the state from involvement through local school districts in the field of education. There is no problem of state involvement under the Fourteenth Amendment—it is simply a question whether the state involvement shall be solely by the local school districts or shall include involvement by the state government as well.

Amici curiae assert that, prior to the adoption of sections 14020 and 14021 of title 5 of the California Administrative Code and the passage of sections 5002 and 5003, local school districts had been very slow in seeking and achieving racial balance in the school system. As a result of the adoption of these sections and their enforcement in the courts, there was a significantly increased activity directed toward preventing, reducing and eliminating racial imbalance in the schools. It appears clear, amici argue, that the repeal pursuant to Proposition 21 (see fn. 3, *ante,* and accompanying test) of sections 5002 and 5003 will have the effect of retarding, if not reversing, this process of establishing racial balance in the schools of California. Finally, it is urged, the avowed purpose of Proposition 21 was opposition to these sections as a "forced integration measure . . . which could only be accomplished through forced busing . . . without regard to neighborhood schools or parental consent." (Ballot Pamphlet, argument in favor of Proposition 21, as presented to the voters of the State of California, General Election (Nov. 7, 1972).)

In one respect the gist of amici's argument is to ask this court to take judicial notice that local school districts fail to fulfill their constitutional obligation to desegregate, and thus to conclude that the passage of

Proposition 21 constituted state involvement in racial discrimination. Even if it were within our province to take such judicial notice, no facts have been presented to us supportive of amici's contention.

In another respect, the essence of the argument is to assert that the policy of the Legislature declared in sections 5002 and 5003 is inherently invulnerable to change through an initiative measure. On the contrary, since racial balance determined according to a precise statutory formula is not a constitutional prerequisite but a matter of state policy, the people of California through the initiative process, have the power to declare state policy. The repealing provisions of Proposition 21 can conceivably be interpreted as an expression by the people of this state of their preference for a "neighborhood school policy." (See *Keyes* v. *School Dist. No. 1, Denver, Colo., supra,* 413 U.S. at p. 206 [37 L.Ed.2d at p. 562].) We deem it unnecessary to the resolution of the issues now before us to determine precisely what was the intention of the electorate in this respect and accordingly intimate no views on the subject. ▇ We merely conclude that since a policy in favor of neighborhood schools is a reasonably conceivable one and since such an expression of policy can in no way limit or affect the constitutional obligations of school districts, the repealing provisions found in sections 2, 3 and 4 cannot be struck down as constitutionally impermissible. It may be that our assessment of the people's desires in this respect is erroneous; if so, constitutional processes are available to the people to reinstate what has been repealed.

We turn now to the second point of the argument, namely that the repealing sections of Proposition 21 (i.e., §§ 2, 3 and 4) cannot be severed from the unconstitutional portion thereof (i.e., § 1 adding § 1009.6 to the Ed. Code) and therefore the proposition in its entirety must fall as unconstitutional.

The rule on severability is set forth in *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892]: "But if the statute is not severable, then the void part taints the remainder and the whole becomes a nullity. It is also true that in considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part. *This is possible and proper where the language of the statute is mechanically severable,* that is, where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase, or even single words. [Citations.] On the other hand, where there is no possibility of mechanical severance, as where the

language is so broad as to cover subjects within and without the legislative power, and the defect cannot be cured by excising any word or group of words, the problem is quite different and more difficult of solution." (Italics added.) (In accord: *Villa* v. *Hall* (1971) 6 Cal.3d 227, 236 [98 Cal.Rptr. 460, 490 P.2d 1148]; *Mulkey* v. *Reitman, supra,* 64 Cal.2d 529, 543-544; *In re Portnoy* (1942) 21 Cal.2d 237, 242 [131 P.2d 1]; *In re Bell* (1942) 19 Cal.2d 488, 498 [122 P.2d 22]; *Bacon Service Corporation* v. *Huss* (1926) 199 Cal. 21, 32-33 [248 P. 235]; *McCafferty* v. *Board of Supervisors* (1969) 3 Cal.App.3d 190, 193 [83 Cal.Rptr. 229].)

Proposition 21 contained a severability clause.[6] The valid repealing portions can easily and accurately be mechanically severed from the invalid portion enacting section 1009.6. "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. [Citation.]" (*McCafferty* v. *Board of Supervisors, supra,* 3 Cal.App.3d at p. 193.) Such a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on whether "the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute" (*In re Bell, supra,* 19 Cal.2d 488, 498) or "constitutes a completely operative expression of the legislative intent . . . [and] are [not] so connected with the rest of the statute as to be inseparable." (*In re Portnoy, supra,* 21 Cal.2d at p. 242.)

Amici curiae merely assert that the various portions of the proposition are clearly inseparable. However, it seems that the valid and invalid portions of the proposition, while subsumed within an overall purpose to eliminate forced integration by busing without regard to the desirability of maintaining neighborhood schools, reflect separable methods of achieving this purpose. The repealing provisions (the valid part) would eliminate a commitment to achieving racial balance in the schools, leaving local school districts with sole responsibility and without direction other than constitutional mandate; the enactment of section 1009.6 (the invalid part) went further and forced upon the local school districts the neighborhood school concept without forced busing as the only acceptable policy. Even though this restriction of local school

---

[6]"If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable."

district discretion is unconstitutional and therefore the full purpose of Proposition 21 cannot be realized, it seems eminently reasonable to suppose that those who favor the proposition would be happy to achieve at least some substantial portion of their purpose, namely to eliminate a state commitment to racial balance in the schools regardless of other considerations, and thereby to allow local control subject only to constitutional restriction. ■ Thus, the repealing provisions are not only mechanically severable in that they are physically separate sections of the proposition, but they are also severable as to purpose and method, of independent validity and not inconsistent with the elimination of the invalid part. We hold the repealing portions of Proposition 21 to be severable. We cannot say that these portions must necessarily fall, because we hold section 1009.6 unconstitutional.[7]

We therefore conclude that Proposition 21 does not provide an independent basis for sustaining the trial court's intended injunction of the implementation of the Administration Plan since section 1009.6 added to the Education Code by the proposition bars assignment of public school students by race and is therefore unconstitutional and void under the decisional law of the United States Supreme Court and of this court, regardless of the proposition's effective repeal of other sections of the code.

We accordingly proceed to address ourselves to the question whether entry of judgment by the trial court on the third count in accord with its memorandum of intended decision would be, an act in excess of its jurisdiction. As we have already stated, the court intended to enjoin implementation of the Administration Plan on two grounds: (1) that the Board had no jurisdiction to close the Garfield and Jefferson Schools because it had failed to include notice of the proposed closure of these schools in its published agenda as required by section 966; (2) that the Board abused its discretion in adopting the Administration Plan which required the closure of the above two schools, when in fact their closure was not reasonably necessary to effective desegregation.

---

[7]Amici curiae also urge that a different test should be applied to the severability of portions of an initiative measure than the above described test applied to statutes passed by the Legislature. However, in applying settled rules of severability, we can discern no meaningful distinctions between statutes "enacted" by the people and statutes enacted by the Legislature. The cases cited by amici curiae (e.g., *Bennett* v. *Drullard* (1915) 27 Cal.App. 180 [149 P. 368]; *Alexander* v. *Mitchell* (1953) 119 Cal.App.2d 816 [260 P.2d 261]) involved the question of severability prior to submission to a vote and also tested severability by the degree of integration between the valid and invalid parts. However, integration is determined by the test set forth by us *supra.*

Section 966 requires a school board to act at meetings open to the public, with certain exceptions relating to personnel and pupil discipline matters, and to post an agenda 48 hours prior to the meeting containing "[a] list of items that will constitute the agenda for all regular meetings."[8] In *Carlson* v. *Paradise Unified Sch. Dist.* (1971) 18 Cal.App.3d 196 [95 Cal.Rptr. 650], the court held · the provisions of section 966 are mandatory, so that noncompliance therewith by failing to list an item of business on the agenda invalidates the board's action in respect thereto. In *Carlson* the school board's agenda listed as one item "Continuation school site change." The action in fact taken was to move the "continuation school" to the Canyon View school building, to discontinue elementary education at that school, and to transfer the Canyon View elementary pupils to Ponderosa School. The court held that the agenda listing "was entirely inadequate notice to a citizenry which may have been concerned over a school *closure* . . . was entirely misleading and inadequate to show the whole scope of the board's intended plans." (*Carlson* v. *Paradise Unified Sch. Dist., supra,* 18 Cal.App.3d at p. 200.)

In the case at bench, the posted agenda of the meeting of May 18, 1972, contained under the heading "Desegregation/Integration Plans" Item No. 3a which read as set forth in the margin.[9] At the meeting, the Board adopted the Administration Plan, which among other things, closed the Jefferson School and discontinued elementary school education at the Garfield School.

The trial court in its memorandum of intended decision concluded: "There was no possible way [the Administration Plan was not written and was not on file] that the public could discern from the posted agenda that the Board was about to consider the closure of two elementary schools, namely, Jefferson and Garfield, as indispensable ingredients of

---

[8]Section 966 provides in pertinent part: "Except as provided in Section 54957 of the Government Code or in Section 967, all meetings of the governing board of any school district shall be open to the public, and all actions . . . shall be taken at such meetings and *shall* be subject to the following requirements: . . . (b) A list of items that will constitute the agenda ·for all regular meetings *shall* be posted at a place where parents and teachers may view the same at least 48 hours prior to the time of said regular meeting . . . ." (Italics added.)

[9]Item 3a headed "Desegregation/Integration Plans" read as follows:

"On February 3, 1972 the Board of Education set the following timetable in regard to a Desegregation/Integration Plan for the Elementary District:

"Thursday, May 4, 1972 - Presentation of plans to the Board
"Thursday, May 18, 1972 - Adoption of a plan by the Board
"September 1972 - Implementation of plan as fully as possible
"It is expected that the Board will take action at the meeting."

any desegregation plan. . . . Any possible reference to such matters in a published newspaper article would in no event suffice to cure the deficiency. . . . The Board did not comply with the provisions of section 966. It therefore lacked jurisdiction to adopt the Administration Plan . . . . The closure of the Jefferson and Garfield elementary schools is essential to this plan, and invalidates the same."

The Board contends that by listing adoption of a desegregation/integration plan, the posted agenda gave full and adequate notice of a wide range of possible Board actions including possible closure of schools. It is common knowledge that a desegregation/integration plan by its very nature involves a complete reworking of the school system and is likely to involve substantial changes in school attendance patterns, including pupil assignment away from neighborhood schools and busing. Thus, the agenda item gave fair warning to parents of students at any of the elementary schools that the adoption of a plan might result in their children's not attending their neighborhood school, that is Jefferson, Garfield or any other elementary school, as the case might be. The fact that their children might end up attending a different school due to closure of their current school rather than to pupil assignment or school pairing is of little moment. The critical point is that parents were on notice that the Board at its meeting on May 18, 1972, might act in such a way that their children would no longer be able to attend Jefferson or Garfield schools.

This case is therefore clearly distinguishable from *Carlson*. There the item "continuation school site change" would have in no way notified parents of children attending Canyon View Elementary School that their children would be affected by such action and certainly would not have warned them that the school might be closed. It gave fair notice to parents of continuation school students as to impending changes and to people generally concerned about financial expenditures and priorities. However, the item in no way warned Canyon View Elementary School parents that their interests might be vitally affected.

In the case at bench, by contrast, the item concerning the adoption of a "Desegregation/Integration Plan," in our view gives clear notice to parents of students attending Jefferson, Garfield or any other elementary school that their interests might be vitally affected. We do not believe that the agenda item must specify the particular means by which the students involved would be sent to different schools, as for example by pupil assignment, busing, pairing of schools or closure of schools. It

seems to us that all such actions are fairly contained within the comprehensive language of the notice.

Indeed, if the agenda had simply indicated the adoption of a "Desegregation/Integration Plan for the Elementary District," we would entertain no doubt that it would have given adequate notice. However, item 3a on the agenda referred to the sequence of procedures adopted by the Board for formation of an integration plan throughout the year—"Thursday, May 4, 1972—Presentation of plans to the Board. Thursday, May 18, 1972—Adoption of a plan by the Board." (See fn. 9, *ante.*) Concerned parents and citizens could reasonably infer from this notice that no new plans were to be presented on May 18 but rather that the Board would adopt one of the plans presented on May 4. If they had no objection to any of these plans, they might reasonably assume there was no need for them to attend the May 18 meeting.

However, the Administration Plan, which had *not* been presented at the May 4 meeting, differed radically from all the previous plans in many respects, most notably in providing for the closure of the Jefferson and Garfield schools. Parents of Jefferson and Garfield elementary school students had no notice that a plan involving closure of those two schools would be considered on May 18. Consequently we think that the notice by referring to the May 4 presentation of plans was misleading, by indicating that only those plans presented on May 4 would be considered for adoption on May 18. This is substantially confirmed by the very elaborate procedures adopted by the Board and participated in by the community in order to prepare and screen plans for presentation to the Board on May 4.

 Section 966 specifies 48 hours' notice with respect to regular meetings. It is a fair construction of the section that a board cannot change its posted agenda within the 48-hour period next immediately preceding a regular meeting; in other words, if a board wishes to change substantially its agenda within that period, it must postpone a meeting at least 48 hours. Since the Administration Plan had not been presented at the May 4 meeting and since it differed substantially from all the other plans, the Board's decision to consider and act upon it represented a substantial deviation from the posted agenda and therefore required an amendment to the agenda and a postponement of the meeting for such a period of time as to provide no less than 48 hours' notice.

It is true that the Board could have adopted a plan involving the

closure of schools, if it had posted an agenda merely giving general notice of intention to adopt a desegregation/integration plan. However, once the Board posted notice that it would adopt one of the plans theretofore presented at the May 4 meeting, it thereby limited its power to consider any other substantially different plan since otherwise the posted agenda would be fatally misleading. It then became necessary for the Board to amend the posted agenda and reschedule the meeting so as to afford notice for the period of time specified by the statute.

The Board contends that the misleading effect of the notice was cured by newspaper publicity indicating that a new plan was to be presented at the meeting of May 18. Two newspaper articles appeared explaining some of the details of the new plan. Only one of the two articles was released 48 hours or more before the meeting. ■ Moreover, newspaper publicity cannot replace the proper posting of an agenda. Section 966 requires notice by means of an agenda posted at a specified place. The newspaper article had no official status, its contents had not been checked or authorized by the Board, and there was no guaranty that it would have been read by all persons entitled to notice. On the other hand, under the statute all persons were presumed to know when and where the agenda of a meeting was to be posted and were entitled to rely on the contents of such statutory notice without being required to scour all newspapers and other publications for possible changes.

■ Accordingly we conclude that the trial court properly determined, albeit for the wrong reason, that the Board had no jurisdiction to consider or approve the Administration Plan due to its noncompliance with section 966. The trial court would therefore not act in excess of its jurisdiction in enjoining the implementation of the Administration Plan, unless and until the plan was adopted by the Board at a meeting preceded by the posting of an accurate and complete agenda as required by section 966.

The trial court, however, went further in its memorandum of intended decision and purported to permanently enjoin implementation of the Administration Plan on the ground that its adoption was an abuse of discretion by the Board since the closure of the two schools was not reasonably necessary to accomplish desegregation.[10] ■ The major premise in the trial court's reasoning—that in desegregating a school

---

[10]Plaintiffs also contend that the Board abused its discretion in adopting the Administration Plan because the plan does not meet the requirements of section 5003. Since we have held the repeal of this section valid, this argument must fail.

system, a school board is limited in the exercise of its powers to those acts reasonably necessary to effectuating desegregation—is utterly without support. The trial court concedes, as indeed it must, that the Board has power to close schools and convert them to other uses. It is, of course true that the Board is not free to exercise this power arbitrarily, but must act reasonably and in accordance with established procedure. "[A] court may not substitute its judgment for that of the administrative board [citation] and if reasonable minds may disagree as to the wisdom of the board's action, its determination must be upheld." (*Manjares* v. *Newton* (1966) 64 Cal.2d 365, 371 [49 Cal.Rptr. 805, 411 P.2d 901].) We have not found, nor have we been referred to, any authority supportive of the proposition that once a school board undertakes a desegregation/integration plan, its otherwise independent power to close schools becomes limited to closing only those schools which must reasonably be closed in order to accomplish desegregation. Acceptance of such a proposition would blind school boards to the full realities of the world about them, as for example, by directing in effect that they are powerless to close unsafe schools because desegregation might be effectuated without such closure.

Indeed the case at bench presents exactly this situation. On August 12, 1971, the Board received a report that the Jefferson school was structurally unsafe within the requirements of section 15503.[11] The report recommended that a structural engineer be retained to determine whether the school should be repaired or abandoned, since if it cannot be repaired, it must be abandoned pursuant to section 15516.[12] On May 15, 1972, three days before the final meeting of the Board, the superintendent received a report concerning the rehabilitation or replacement costs of the Jefferson school. The report found that it would cost $621,800 to make the existing structure safe and $655,000 to build an entirely new building. Accordingly, in fashioning the Administration Plan, the superintendent made provision therein for closing the Jefferson school. The Board would certainly be properly exercising its discretion in a reasonable manner were it to approve abandoning this building in view

[11]Section 15503, added in 1959 as part of the Field Act, requires all school buildings, not constructed pursuant to the Field Act, to be examined by January 1, 1970, in order to determine whether the building is safe for school use according to the standards set forth in the Field Act (§ 15451 et seq.). If a school building is found to be unsafe, the governing board of that school district must prepare an estimate of the cost necessary to make the building safe.

[12]Section 15516 provides: "No school building examined and found to be unsafe for school use pursuant to Section 15503 and not repaired or reconstructed in accordance with the provisions of this article shall be used as a school building for elementary and secondary school or community college purposes after June 30, 1975."

of the extreme cost. The determination of the questions whether a new school was needed to replace this structure or whether existing facilities could handle the Jefferson school students due to an expected drop in elementary enrollment, was properly within the Board's discretion. We do not think that the Board in exercising this discretion was perforce limited to determining the reasonable necessity of replacing the building and thus automatically precluded from determining the necessity of assigning students in order to achieve desegregation.

In 1969 the Board adopted a master plan to guide the development of the school district. Item 6 of that plan provided: "As soon as funds become available in the Elementary District to provide housing at expanded schools elsewhere, that Garfield School be closed and convert-ed to a Special Education Center to provide for certain parts . . . of the Special Education program." The superintendent incorporated this provision into his Administration Plan. Absent proof that there were no school facilities to absorb these students or no need for a special education center,[13] the Board, in the reasonable exercise of its discretion, could lawfully take this action. The mere fact that this action was part of a desegregation plan did not automatically strip the Board of its otherwise subsisting authority to act in this area, so that the establish-ment of an education center was contingent upon it being reasonably necessary to accomplish desegregation.

■ Since the trial court proposed to so limit the discretion of the Board, it would be substituting its judgment for that of the school board and therefore acting in excess of its jurisdiction. A writ of prohibition is the appropriate remedy where a threatened judgment of the trial court will be in excess of its jurisdiction. (*City & County of S.F.* v. *Superior Court* (1959) 53 Cal.2d 236, 243 [1 Cal.Rptr. 158, 347 P.2d 294]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, §§ 36, 39, pp. 3810-3811, 3813.)

As to the instant writ proceeding (L.A. 30054) which is confined to plaintiffs' third cause of action below, we arrive at these final conclu-sions: (1) That section 1009.6 being unconstitutional and void does not bar the Board's Administration Plan for desegregation; (2) that the Board's power to close schools exists independently of its constitutional obligation to desegregate and is not contingent upon such closure being

---

[13]School boards have the authority to provide special education programs and facilities. (§§ 6500-6742, 6750-6946.)

reasonably necessary to effectuate desegregation; (3) that the posted agenda was defective insofar as it related to the closure of the two elementary schools because of the Board's failure to comply with section 966 and that, since said proposed action for closure was an inseparable part of the Administration Plan, the adoption of the plan as a whole was invalid because of such noncompliance; and (4) that in respect to the third count the trial court will not act in excess of its jurisdiction by enjoining the implementation of the Administration Plan upon the basis heretofore set forth by us, namely, for the failure of the Board to comply with section 966 but that in all other respects the intended action of the trial court as set forth in its memorandum of intended decision is in excess of the court's jurisdiction. Nothing herein, of course, shall prevent, or be deemed to prevent, the Board from adopting the Administration Plan at a new meeting held upon proper notice and in compliance with all other legal requirements.

It follows that in L. A. 30054, petitioners (defendants below) are not entitled to a peremptory writ of prohibition restraining respondent court from enjoining the implementation of the Administration Plan for failure of the Board to comply with section 966 but are entitled to such writ restraining the court's intended action in all other respects. (See *Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 566 [212 P.2d 878]; see 5 Witkin, Cal. Procedure (2d ed. 1971) p. 3933.) The writ shall issue. accordingly.

## II

We now turn our attention to the appeal before us. (See fn. 2, *ante.*) This is from a judgment entered on the first two causes of action which were not stayed by our alternative writ of prohibition. The central issue here confronting us is whether the Board may lawfully be the common governing Board of both the Santa Barbara (elementary) School District and the Santa Barbara High School District despite the fact that such districts are not coterminous.

We deem it necessary to set forth the facts in some detail. The original Santa Barbara School District, which was organized sometime in the 1870's, comprised all the public schools within the city limits and conducted classes from kindergarten through high school, under the leadership of the school trustees. The initial charter for the City of Santa Barbara, adopted February 20, 1899, created a school department, consisting of all the public schools in the school district, governed by a

five-man board of education. The charter specified the duties and powers of the board of education in great detail and provided that the board succeeded to all the property and rights of the former school trustees.

In 1902 this single geographical school district was divided functionally into two separate districts: the elementary school district (known as the Santa Barbara School District) and the high school district (known as the Santa Barbara High School District), comprising both junior and senior high schools. The two districts were coterminous; their boundaries were the city limits. The single board of education remained responsible for the governing of all the public schools in the school districts, since the charter was not amended following this functional division into two school districts. Upon the adoption of new charters in 1918 and again in 1927, former provisions dealing with the board of education were revised and simplified by replacing the detailed enumeration of the board's duties and powers with an incorporation of provisions set forth in the general laws of the state. Despite these revisions, nevertheless, the new charters retained a *single* board of education invested with control over all schools in that city.[14]

Indeed the 1927 charter specified a single board of education even though the two school districts were no longer coterminous themselves or with the city. From 1902 to 1930 while the elementary school districts remained virtually constant in size, incorporating only minor portions of adjacent unincorporated territory, the high school district annexed large portions of adjacent territory and far outstripped the elementary school district in size. By 1930 the pattern of annexations was complete. The high school district was comprised of the original high school district (i.e., coterminous with the city limits and the elementary school district) plus the geographical area of four additional elementary school districts, Montecito Union School District, Cold Springs School District, Hope School District and Goleta Union School District. These four elementary school districts were annexed solely for the purpose of becoming part of the Santa Barbara High School District. They continued to function as

---

[14]Section 83 of the Charter of the City of Santa Barbara adopted in 1927 provided: "The Board of Education shall consist of five members. . . ."

Section 84 provided: "The Board of Education shall have the entire control and management of the public schools in the city of Santa Barbara in accordance with the constitution and general laws of the state and said board is hereby vested with all the powers and charged with all the duties of such control and management."

Sections 55 and 56 of the charter adopted in 1918 contained virtually identical provisions.

wholly independent elementary school districts governed by their own elementary school board.

Despite these changes in the composition and size of the elementary and high school districts no change was made in the charter. That instrument continued to direct, as it did upon its adoption in 1927 that there be a single board of education having the entire control and management of all the public schools. In 1939, section 83 of the charter (see fn. 14, *ante*) was amended to provide that the members of the board should serve staggered six-year terms.

No further changes were made in the charter provisions concerning the board of education until a new charter was adopted in 1967. The new charter retained the provision for a single elective board of education, directed that its adoption should not affect boundaries of existing school districts and generally provided that all other requirements should be "as now or hereafter prescribed by the Education Code."[15] Despite the changes in language the new charter provisions continued essentially the same educational scheme. The changes appear to correspond with those introduced into the Education Code in 1963, since section 900 of the charter tracks the language of section 1223 of the code.[16] Thus, in short the charter directs that there shall be an elective board of education and leaves other requirements to those found in the code.

Section 1224 provides that the members of the board of education shall be elected at large from the territory within the boundaries of the school district or districts under the jurisdiction of the board of education, that for election purposes such territory shall include outside territory annexed to the city for school purposes, and that all qualified electors residing within the full territory shall be eligible to vote for, and

[15]Article IX of the charter headed, Board of Education, provides: "Section 900. State Law Governs. The manner in which, the times at which, and the terms for which the members of the Board of Education shall be elected or appointed, their qualifications, compensation and removal and the number which shall constitute such board shall be as now or hereafter prescribed by the Education Code of the State of California.

"Section 901. Effect of Charter on District. The adoption of this Charter shall not have the effect of creating any new school district nor shall the adoption of this Charter have any effect upon the existence or boundaries of any present school district within the City or of which the City comprises a part."

[16]Section 1223 of the Education Code provides: "Except as provided in Section 1222, whenever the charter of any city fails to provide for the manner in which, the times at which, or the terms for which the members of the city board of education shall be elected or appointed, for their qualifications, removal, or for the number which shall constitute such board, the provisions of this division shall apply to the matter not provided for."

to be a member of, the board of education.[17] Therefore all qualified electors residing within the high school district, which is geographically coterminous with the five elementary school districts—the Santa Barbara elementary school district plus the four annexed districts (Montecito, Cold Springs, Hope and Goleta)—are entitled to vote for the city board of education. At the time of trial, there were 80,203 registered voters residing within the high school district, of whom 38,174 or 47.6 percent resided within the Santa Barbara elementary school district and 42,029 or 52.4 percent resided within the four annexed elementary school districts.

The four annexed elementary school districts continued to be governed by four separate elementary school boards elected separately by qualified electors residing within each elementary school district. The Santa Barbara elementary school district, however, did not have its own separate elementary school board. Instead, by virtue of the charter provisions and section 1222 of the Education Code incorporated in the charter (see fn. 15, *ante*), the Santa Barbara elementary school district was governed by the city board of education.[18] Thus, an elector residing within one of the four annexed districts, for example Montecito, would be entitled to cast two votes—one to elect members to the Montecito Elementary School Board from the residents within that district and one to elect members to the city board of education. An elector residing within the Santa Barbara elementary school district would be entitled to cast only one vote—that one being to elect the city board of education.

As mentioned earlier, plaintiffs in their first two causes of action challenge the validity of the law permitting the city board of education to govern both the high school and the elementary school districts, despite the fact that the two districts are not coterminous. The first cause of

[17]Section 1224 provides: "The members of any elective city board of education shall be elected at large from the territory within the boundaries of the school district or districts which are under the jurisdiction of the city board of education, whether sitting as a board of education, high school board, or community college board, and any qualified elector of the territory shall be eligible to be a member of such city board of education.

"When outside territory has been annexed to a city for school purposes it shall be deemed a part of the city for the purpose of holding the general municipal election, and shall form one or more election precincts, as may be determined by the legislative authority of the city. The qualified electors of the annexed territory shall vote only for the board of education or the board of school trustees."

[18]Section 1222 provides: "Whenever the charter of a city comprising in whole or in part an elementary school district, fails to provide for the manner in which, the times at which, and the terms for which the members of the board of education of such city are appointed, and for the number which shall constitute such board, *the governing board of the elementary school district* within which the city is located or with which the city is coterminous *is the board of education of the city.*" (Italics added.)

action alleged that this system unconstitutionally diluted the vote of each registered voter and taxpayer within the elementary school district by over 100 percent by virtue of the votes cast by that portion of the electorate who live outside the Santa Barbara elementary school district. The second cause of action alleged that this system violated the requirements of section 924 that the governing board of an elementary school district shall consist of members elected at large from the territory comprising the elementary school district.

Following trial by the court on these two causes of action, the court made findings of fact, substantially as recited above and concluded in essence that the above voting scheme was unconstitutional as being violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution. We set forth in pertinent part in the margin the court's detailed conclusions.[19]

---

[19]"4. Insofar as the Board governs the affairs of the Elementary School District the scheme which permits the votes of 38,174 resident electors to be counted equally with the votes of the 42,029 non-resident electors, who are in no way concerned with the government of the Elementary District, constitutes a clear denial, dilution and debasement of the vote of the resident electors of the Elementary District and a deprivation of their constitutional right to the equal protection of the law.

" . . . . . . . . . . . . . . . . .

"7. The present dual function of the School Board governing a large high school district and much smaller elementary school district does not serve any governmental purpose, but is rather the result of unplanned, irregular annexations to the High School District.

" . . . . . . . . . . . . . . . . .

"9. The fact in this case that voters who reside outside the boundaries of the Elementary School District, who exceed in number those who reside within the district, are given the right to vote for the School Board which formulates policy for the district, even though they are in no way subject to such policy and do not contribute any tax support thereto, is contrary to the principle that the government is to be chosen by the governed.

"10. The equal voting strength principle, which underlies the 'one person, one vote' doctrine, applies in this case to the electoral scheme currently employed in the election of members to the governing board of the Santa Barbara Elementary School District. That principle is violated because the votes of qualified resident electors in the plaintiffs' class are being wrongfully denied, debased and diluted by the votes of non-qualified, non-resident electors in the Elementary District election.

"11. There is no State interest sufficiently compelling to justify the voting scheme described herein. That scheme is unconstitutional. It violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

" . . . . . . . . . . . . . . . . .

"14. To interpret Section 1224 of the Education Code to sanction the election of a common governing board for two districts whose boundaries are not coterminous, by electing the members of such board at large from the territory of the larger district, which encompasses all of the area of the smaller district plus added territory of the larger district, is to unconstitutionally apply the statute.

"15. Section 1224 of the Education Code must be interpreted to grant common

By way of remedy the court concluded that the Santa Barbara elementary school district must be governed by an independent board of resident electors of the Santa Barbara elementary school district elected at large from the territory within the elementary school district; that the present city board of education should be allowed to continue as the governing board of the high school district; that a new board consisting of five members and governing only the elementary school district should be elected on April 17, 1973, by resident electors within the Santa Barbara elementary school district and take office on July 1, 1973; that the three members with the highest vote should serve until June 30, 1977, and the remaining two members should serve until June 30, 1975, each member of the board thereafter serving a four-year term. Judgment granting a peremptory writ of mandate was entered accordingly. This appeal by defendants followed.[20]

We begin by epitomizing the respective positions of the parties on the appeal. Plaintiffs contend that the method of electing members of the Santa Barbara Board of Education is invalid under the state and federal Constitutions as violative of the "one man, one vote" principle because the votes of *qualified, resident* electors in the elementary school district are debased and diluted by the votes of *nonqualified, nonresident* electors in the elementary district election. Plaintiffs argue that there should be, and the trial court properly ordered, a separate board of education to govern the elementary school district. Defendants, on the other hand, contend that the present method of electing members of the Board complies with applicable state law, that it does not violate the "one man, one vote" rule, and that the trial court's ruling on this issue is in error. ■ As we explain, *infra,* we conclude that there is no constitutional right to a separate, elected elementary board of education, that there is no constitutional infirmity in designating the city board of education, elected from the full territory within its jurisdiction, to govern the lesser, wholly included elementary school district and that the "one man, one vote" principle has no relevancy to this case.

The city board of education is elected. Each qualified elector residing within the high school district, the largest geographical area within the

governing powers to an elective city board of education over two or more districts under its jurisdiction only in cases where the boundaries of the governed districts are coterminous. In a case such as here presented, where the boundaries of the districts are not coterminous, Section 1224 may not be so interpreted to grant multiple jurisdiction to such a single elective board."

[20]See footnote 2, *ante,* where the procedural history of this appeal as related to the disposition of the third cause of action is explained.

jurisdiction of the board of education, is eligible to become a member of the board and is entitled to vote in the election. The members are elected at large. Each vote counts equally and is weighted equally. Each qualified elector is governed by the board, subject to the policy adopted by the board, and liable for tax to support the board. It is clear and undeniable that the city board of education is elected in full compliance with the "one man, one vote" principle.

Indeed, as they must, plaintiffs concede the election of the city board of education is valid. However, plaintiffs claim that the election of the city board of education is also an election of the governing board of the Santa Barbara elementary school district and that the *latter* election violates the "one man, one vote" principle because the votes of nonresident electors dilute the votes of the electors residing in the Santa Barbara elementary school district. There is no basis in law or fact to support this claim. There is a single city board of education which is elected in a single election by qualified resident electors. This single city board of education, by virtue of section 1222, (see fn. 18, *ante*) is the governing board of the Santa Barbara elementary school district.[21] The city board of education, which is elected in accordance with section 1224 (see fn. 17 *ante*) is designated by the Legislature in section 1222 to govern the Santa Barbara elementary school district.

Thus, it is abundantly clear that the election of the city board of education is a single election of a single board. The real claim advanced by plaintiffs is that they, the resident voters, taxpayers and parents within the Santa Barbara elementary school district are entitled to be governed by an independent school board, comprised of members who reside within the district and elected solely by voters who reside in the district. The United States Supreme Court has held to the contrary. In *Sailors* v. *Board of Education* (1966) 387 U.S. 105, 108, 110-111 [18 L.Ed.2d 650, 653, 655, 87 S.Ct. 1549], the high court held that there is no constitutional right to elect members of boards of education: "We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election. . . . [¶] Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects nonlegisla-

---

[21]See test accompanying footnotes 15 and 16, *ante*.

tive officers, a State can appoint local officials or elect them or combine the elective and appointive system as was done here. . . . For while there was an election here for the local school board, no constitutional complaint is raised respecting that election. Since the choice of members of the county school board did not involve an election and since none was required for these nonlegislative offices, the principle of 'one man, one vote' has no relevancy."

The principles announced in *Sailors* were recently applied in California in *O'Keefe* v. *Atascadero County Sanitation Dist.* (1971) 21 Cal.App.3d 719 [98 Cal.Rptr. 878] to a factual situation so closely analogous to the facts in this case that we regard that case as highly persuasive authority. In *O'Keefe* the residents of the Atascadero sanitation district, which was located in San Luis Obispo County, challenged the procedure by which the directors of the sanitation district were selected. The county is divided into five districts for the purpose of electing the board of supervisors. The sanitation district was located wholly within the boundaries of one of the five supervisorial districts. The population within the sanitation district was approximately 10 percent of the county population. By virtue of state law, the directors of the sanitation district were the board of supervisors. Since the residents of the sanitation district lived wholly within one supervisorial district, they were able to vote for only one director, while the other nonresident voters elected the other four directors of the sanitation district. The sanitation district residents claimed that their votes were diluted and debased by the votes of electors who resided outside the sanitation district but within the county.

The court concluded, however, that the directors of the sanitation district were not elected but designated by the Legislature and that the election of a board of supervisors was a single election of a single board. "The board of directors of a county sanitation district is not elected. Rather, the members of such board are designated in Health and Safety Code section 4730. The composition of the board is determined by the location of the district in relation to other political subdivisions within the county. . . .[4] [¶] Since the board of directors is not chosen by election, the 'one man, one vote' principle is not applicable . . . . Appellant argues that the principle nevertheless is applicable under the facts alleged,

---

"[4]Health and Safety Code section 4730: 'The governing body of a sanitation district is a board of directors of not less than three members. . . . If the district includes no territory which is in cities or sanitary districts, then the county board of supervisors is the board of directors of the district.' "

because the county board of supervisors is elected [fn. omitted] and the members of the board of directors of the Sanitation District are 'in effect elected once removed.' . . . [¶] Under section 4730 the members of the board of directors of a sanitation district are chosen by the Legislature, a method expressly sanctioned in *Sailors.*" (*O'Keefe* v. *Atascadero County Sanitation Dist., supra,* 21 Cal.App.3d at pp. 724-726.)

As in *O'Keefe,* the members of the governing board of the Santa Barbara elementary school district are designated by the Legislature. The Legislature in section 1222 (see fn. 21, *ante,* and accompanying text) designates the city board of education to be the governing board of the Santa Barbara elementary school district. This is an entirely proper procedure under *Sailors.* The fact that the city board of education is elected does not somehow constitute an election "once removed" of the governing board of the Santa Barbara elementary school district just as the election of the county board of supervisors did not constitute an election "once removed" of the directors of the sanitation district in *O'Keefe.*

We discern no constitutional infirmity in a system whereby the Legislature designates an elected city board of education to govern a lesser included elementary school district. We hold therefore that the present method of electing members of the Santa Barbara Board of Education is not violative of either the United States Constitution or the California Constitution and is in all respects valid under applicable state law.[22]

In L.A. 30054 let a peremptory writ of prohibition issue in accordance with the views herein expressed.

In L.A. 30086 the judgment is reversed and the cause is remanded to the trial court with direction to enter judgment in favor of defendants on the first and second stated causes of action set forth in plaintiffs' complaint.

---

[22]The second cause of action claiming that the system whereby the city board of education is designated to serve as the governing board of the Santa Barbara elementary school district violated the provisions of section 924 has apparently been abandoned, since the trial court made no mention of it and since it has not been urged on appeal. Moreover, section 1222 rather than section 924 controls where a charter city with a city board of education is involved.

Petitioners shall recover costs in L.A. 30054 and defendants shall recover costs in L.A. 30086.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Burke, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.