Filed 8/24/21; certified for partial publication 9/21/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SIERRA WATCH, | C087892 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0038917) |
| v. | |
| PLACER COUNTY et al., | |
| Defendants and Respondents; | |
| SQUAW VALLEY REAL ESTATE et al., | |
| Real Parties in Interest and Respondents. | |

In 2016, Placer County (the County) approved a project to develop a resort on about 94 acres near Lake Tahoe. Sierra Watch afterward challenged the County's approval in two lawsuits, both of which are now on appeal. In one of its suits, it alleged the County's environmental review for the project was inadequate. In another, it alleged the County approved the project in violation of the Ralph M. Brown Act (Brown Act,

1

Gov. Code,[1] § 54950 et seq.) — an act intended to facilitate public participation in local government decisions.

This appeal concerns Sierra Watch's Brown Act allegations and involves two of the act's requirements. Its first claim concerns section 54957.5 of the Brown Act. Under that statute, in the event a county distributes to its board of supervisors any writing pertinent to an upcoming board meeting less than 72 hours before that meeting, the county must make that writing "available for public inspection" at a county office "at the time the writing is distributed" to the board. We consider here two competing interpretations of this statute. To satisfy section 54957.5's requirements, must the writing simply be placed in a county office that allows for public inspection of documents "at the time the writing is distributed" to the board, or must the writing be placed in this office and actually available for public inspection "at the time" of distribution? Considering the statute's plain language and purpose, we find the latter is true. In most instances, the distinction between the two interpretations is irrelevant, as a writing is generally available for public inspection at the moment it is placed in a location allowing for public inspection. But that is not true when, as in this case, the county places the writing in a county office at a time the office is closed to the public — for example, on a weekend. In that event, the writing is not actually available for public inspection until the office reopens to the public, and so is not available at the time required under section 54957.5.

Sierra Watch's second claim concerns section 54954.2 of the Brown Act. Under that statute, counties must post an agenda before each board meeting "containing a brief general description of each item of business to be transacted or discussed at the meeting." The County here, in its agenda, informed the public that its board would consider approving a development agreement that its planning commission had recommended.

---

[1]     Undesignated statutory references are to the Government Code.

2

But in the end, the County's board never considered that particular agreement. It instead considered and then approved a materially revised development agreement that County staff, in consultation with the project applicant and another party, had prepared the night before the meeting. The question we consider is whether the board's consideration of this revised agreement, rather than the one referenced on the County's agenda, rendered its agenda misleading. We find it did.

Because the trial court found differently on both of these issues, we reverse in part. But although we find the County's conduct violated the Brown Act, we reject Sierra Watch's request that we vacate the County's approvals.

BACKGROUND

I

*Factual Background*

In 2011, Squaw Valley Real Estate LLC (Squaw) proposed a project titled the Village at Squaw Valley Specific Plan, which involves a proposed development on about 94 acres in Olympic Valley (formerly known as Squaw Valley). Shortly after, the County began environmental review for the project under the California Environmental Quality Act (CEQA), and in 2015, the County released a draft document, called an Environmental Impact Report or EIR, analyzing the project's potential impacts.

Several parties afterward expressed concern over the County's analysis of the project's environmental impacts, including Sierra Watch and the California Attorney General. According to the Attorney General, the County's EIR insufficiently analyzed project impacts from increased vehicle use in the Lake Tahoe Basin. The Attorney General's office initially expressed these concerns in August 2016 in a formal comment letter, and later, in early November 2016, it reiterated these concerns in an e-mail to County counsel. In the e-mail, the deputy attorney general assigned to the matter offered to speak with County staff about her office's concerns but warned that, absent additional environmental review, her office would file litigation challenging the County's EIR.

3

Shortly after receiving this e-mail, on November 9, 2016, the County posted the agenda for the upcoming meeting of its board of supervisors (the Board), during which the Board would consider whether to approve the EIR for the project. Among other things, the agenda informed the public that the Board would consider at its November 15, 2016 meeting "a recommendation from the Placer County Planning Commission for APPROVAL of the following": (1) "a resolution to certify the Village at Squaw Valley Specific Plan Final Environmental Impact Report" and (2) "an ordinance to approve the Development Agreement relative to the Village at Squaw Valley Specific Plan." At the same time it posted the agenda, the County also made available for public inspection various documents discussed on the agenda, including the proposed development agreement for the project.

The same day the County posted the agenda, two deputy attorneys general met with County counsel and Squaw's counsel about the project. At the meeting, the two deputy attorneys general asked the County to require Squaw to pay an air quality mitigation fee to the Tahoe Regional Planning Agency (TRPA). But the County declined to do so. Squaw, however, thought it better to pay the fee if the Attorney General would agree not to sue over the project. It approached the Attorney General about such an agreement and offered to ask the County to amend the development agreement for the project to include a requirement that it pay the TRPA fee. Squaw and the Attorney General afterward reached an agreement along these lines on November 14, 2016.[2] Shortly after, at Squaw's request and in consultation with the Attorney General, County counsel updated the development agreement to accommodate the agreement between Squaw and the Attorney General. To that end, she added a provision requiring Squaw to

---

[2]      Squaw and the Attorney General's agreement was initially reflected in a series of e-mails. On January 4, 2017, the parties also entered into a formal contract.

4

pay $440,862 in fees to be used for TRPA "Environmental Improvement Projects," which are projects intended to reduce traffic and improve air and water quality at Lake Tahoe.

County counsel afterward, at 5:36 p.m. on November 14, 2016, e-mailed the County clerk the updated development agreement and a memorandum (the Schwab Memorandum) explaining the change and providing other information about the project. On receiving the e-mail, the County clerk placed copies of the development agreement and the memorandum in an office where the public can inspect County records — namely, the County clerk's office, which is open to the public from 8:00 a.m. to 5:00 p.m. on weekdays. At 5:42 p.m., the County clerk e-mailed the two documents to all Board members.

A few minutes before the County clerk shared the new materials with the Board, a deputy attorney general e-mailed Sierra Watch's counsel about the development. Without going into detail, she informed Sierra Watch's counsel that Squaw had agreed "to mitigate . . . the Project['s] in-basin trips as if the project were located in the basin." She also offered to talk about the new mitigation requirements, but Sierra Watch's counsel did not see the e-mail until after the Board's meeting began the following day.

The Board held its meeting the next day, which Sierra Watch attended. Before the meeting began, County staff placed at a public table at the meeting copies of the Schwab Memorandum and other project documents. Following some discussion of the development agreement, including the new TRPA provision, the Board voted in favor of the ordinance approving the agreement.

II

*Procedural Background*

A couple of weeks after the Board approved the development agreement and the EIR for the project, Sierra Watch sent a letter to the County alleging it had violated the Brown Act. The Brown Act imposes various requirements on local agencies, including counties, intended to ensure that their actions and deliberations are conducted openly.

5

(§ 54950.)  According to Sierra Watch's letter, the County violated two of these requirements.  First, it alleged the County violated section 54954.2 of the Brown Act, which requires counties (and other local agencies) to post an agenda at least 72 hours before each board meeting "containing a brief general description of each item of business to be transacted or discussed at the meeting."  (§ 54954.2, subd. (a)(1).)  Sierra Watch reasoned the County's agenda was insufficient because it did not "announc[e] . . . that [the Board] was to consider a substantive amendment to the proposed Development Agreement" — namely, the addition of the TRPA-fee provision.  Second, it alleged the County violated section 54957.5 of the Brown Act, which requires counties (and other local agencies), when distributing any meeting material to their boards less than 72 hours before an open meeting, to make that writing "available for public inspection . . . at the time the writing is distributed to all, or a majority of all, of the [board] members." (§ 54957.5, subd. (b).)  The County violated this requirement, Sierra Watch asserted, because it failed to make the Schwab Memorandum available to the public at the same time it was distributed to the Board members.  The County, however, disagreed with both Sierra Watch's allegations and declined to reconsider its approvals.

Shortly after receiving the County's response, Sierra Watch filed a petition for writ of mandate and complaint for injunctive and declaratory relief against the County and its Board.  Sierra Watch alleged in its suit the two issues it raised in its letter:  The County violated section 54954.2 because its agenda failed to notify the public that the Board would consider a substantive revision to the development agreement, and it violated section 54957.5 because it failed to make the Schwab Memorandum available for public inspection at the same time it was distributed to the Board.  After the County successfully demurred to Sierra Watch's cause of action under 54954.2, Sierra Watch modified its allegations somewhat in an amended petition and complaint.  In its amended petition and complaint, it alleged the County violated section 54954.2 because its "posted agenda listed no item of business describing that the Board would consider approving the

6

substance of an agreement . . . between the County, Attorney General's Office, and [Squaw] to purportedly address serious concerns about the Project's impacts on the Lake Tahoe Basin, which was memorialized in a substantive revision to the . . . Development Agreement." Sierra Watch asked the trial court to, among other things, nullify the Board's approval of the development agreement, grant injunctive relief, and declare that the County violated the Brown Act.

Following a bench trial, the court rejected Sierra Watch's claims, starting with Sierra Watch's claim under section 54954.2. In the court's view, to determine whether the County violated this provision, it needed to consider whether the TRPA provision "constituted a distinct item of business which needed to be separately identified on the agenda, or whether the amended Development Agreement differed radically from the previous version of the Development Agreement to such an extent as to make the agenda misleading." But because it found neither true, it rejected Sierra Watch's claim. The court turned next to Sierra Watch's claim under section 54957.5. Rejecting Sierra Watch's contentions, it found the County made the Schwab Memorandum available for public inspection at the same time the memorandum was distributed to the Board members. It reasoned that the County clerk made the memorandum available for public inspection the moment she placed it in the County clerk's office — which she did around the same time she e-mailed the memorandum to the Board — even though the clerk's office was closed at that time.

Sierra Watch timely appealed.[3]

---

[3]    Around the same time it challenged the County's action under the Brown Act, Sierra Watch also challenged the County's action under CEQA. In that case too, the trial court ultimately rejected all Sierra Watch's claims. Sierra Watch afterward appealed the court's decision, which we consider in the separate case of *Sierra Watch v. Placer County et al.* (Aug. 24, 2021, C088130) [nonpub. opn.].

7

DISCUSSION

I

*The County's Disclosure of the Schwab Memorandum*

We consider first whether the County violated the Brown Act's disclosure requirements under section 54957.5.

Under section 54957.5 of the Brown Act, a county must disclose writings that are distributed to all or most of the county's board of supervisors "in connection with a matter subject to discussion or consideration" at the board's open meetings. (§ 54957.5, subd. (a).) In most circumstances, section 54957.5 requires these writings to "be made available upon request without delay." (§ 54957.5, subd. (a).) But when these writings are distributed to all or most board members less than 72 hours before an open meeting, it imposes a slightly different requirement in terms of when and where these writings must be made available. Under these circumstances, subdivision (b)(1) of section 54957.5 describes when these public records must be made available: If a "public record . . . that relates to an agenda item for an open session of a regular meeting of [a county's board of supervisors], is distributed less than 72 hours prior to that meeting, the writing shall be made available for public inspection pursuant to paragraph (2) at the time the writing is distributed to all, or a majority of all, of the members of the [board]." Subdivision (b)(2) of section 54957.5 then describes where these public record must be made available: "A [county] shall make [the] writing . . . available for public inspection at a public office or location that the [county] shall designate for this purpose." Subdivision (b)(2) adds that "[t]he [county] also may post the writing on the [county's] Internet Web site in a position and manner that makes it clear that the writing relates to an agenda item for an upcoming meeting." Should a county fail to abide by these requirements, an interested person cannot nullify the county's resulting actions but can seek declaratory and injunctive relief. (§ 54960, subd. (a).)

8

With those requirements in mind, we turn to the issue before us.  The Schwab Memorandum, as all parties agree, was a public record related to an agenda item for one of the Board's open meetings and was distributed to all the Board members less than 72 hours before that meeting.  Under those circumstances, as all parties further agree, the County needed to make the memorandum "available for public inspection" at the same time it was distributed to the Board members.  (See § 54957.5, subd. (b).)  The question here is whether it did.  The County, its Board, Squaw, and Squaw Valley Resort LLC (collectively, respondents) argue it did, reasoning the County complied with section 54957.5 because it placed the Schwab Memorandum in an office where records are "available for public inspection" at the same time it distributed the memorandum to the Board — that is, around 5:40 p.m. on November 14, 2016.  Sierra Watch, in contrast, argues otherwise.  Because the memorandum was placed in the County clerk's office after hours, it contends the County made the memorandum "available for public inspection" only when the office reopened on November 15, 2016.

We find Sierra Watch has the better argument.  Section 54957.5 is not, as respondents believe, merely concerned with the time a record is *placed* in a location allowing for public inspection; it is instead principally concerned with the time a record is actually *available* for public inspection.  That is plain from the statutory text.  Per section 54957.5, subdivision (b)(1), "the writing shall be made *available* for public inspection . . . *at the time* the writing is distributed to all, or a majority of all, of the members of the [board]."  (Italics added.)  In this case, the County distributed the Schwab Memorandum to the Board around 5:40 p.m. on November 14, 2016.  The question for us, then, is whether the memorandum was "available for public inspection . . . at th[at] time."  It was not.  No document at the County clerk's office, after all, was "available for public inspection" at 5:40 p.m. on November 14, 2016 — a time when the clerk's office was closed.

9

Respondents, reading section 54957.5 somewhat differently, contend the statute's plain language instead requires a ruling in their favor. They argue as follows: (1) Subdivision (b)(1) of section 54957.5 required the County to make the memorandum "available for public inspection pursuant to [subdivision (b)(2)] at the time the writing [wa]s distributed to all, or a majority of all, of the members of the [Board]." (2) Subdivision (b)(2), in turn, required the County to make the memorandum "available for public inspection at a public office or location that the [County had] designate[d] for this purpose." (3) Putting these two requirements together, the County fully complied with section 54957.5 because it placed the memorandum in the County clerk's office at the time it was distributed to the Board.

But subdivisions (b)(1) and (b)(2), read together, did not simply require the County to place the memorandum in the County clerk's office at the time it was distributed to the Board. Both these subdivisions, again, are principally concerned with the time that records are actually available for public inspection, not merely the time that these records are placed in areas allowing for public inspection. Subdivision (b)(1) describes *when* these records must be "available for public inspection" — namely, "at the time the writing is distributed to all, or a majority of all, of the members of the [board of supervisors]." Subdivision (b)(2) then describes *where* these records must be "available for public inspection" — namely, "at a public office or location that the agency shall designate for this purpose." Together these subdivisions required the memorandum here to be available for public inspection "at a public office or [other designated] location" (§ 54957.5, subd. (b)(2)) "at the time the writing [wa]s distributed to all, or a majority of all, of the members of the [Board]" (§ 54957.5, subd. (b)(1)). But again, that did not happen. More specifically, the Schwab Memorandum was not available for public inspection at the County clerk's office around 5:40 p.m. on November 14, 2016 — the time the memorandum was distributed to the Board. It instead was first available for

10

public inspection at the clerk's office a day later, when the clerk's office reopened. The County violated section 54957.5 as a result.

Apart from their textual argument, respondents also assert that accepting Sierra Watch's position would lead to several absurd results. First, they contend Sierra Watch's position will at times force counties to delay when they distribute materials to their board members. That is so, they explain, because if a county would like to deliver certain materials to its board at, say, 6:00 p.m. on a Friday in advance of a Monday meeting, it would need to wait until its offices reopened on Monday to send the materials.

Sierra Watch, in response, contends this is not necessarily so because agencies could always post their materials online to comply with section 54957.5, subdivision (b). But we are not so sure. Section 54957.5 does not say agencies may make records available at a physical location *or* alternatively post the records online — though some committee analyses on the bill enacting section 54957.5, subdivision (b) did interpret it this way. (See Sen. Rules Com., Analysis of Sen. Bill No. 343 (2007-2008 Reg. Sess.) p. 2 [to make "writings available for public inspection," this bill requires a local agency to "do *either* of the following": (1) "[m]ake the writing available at an office or location that has been designated by the agency and listed on the meeting agenda; *or*" (2) "[p]ost the writing on the local agency's Internet Web site" (italics added)]; Sen. Local Gov. Com., Analysis of Sen. Bill No. 343 (2007-2008 Reg. Sess.) pp. 1-2 [same].) The statute instead says agencies "*shall*" make records available at a physical location *and* "also *may*" post the records online. (§ 54957.5, subd. (b)(2), italics added; see *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 ["the word 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory, particularly when both terms are used in the same statute"]; *Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490 [" 'If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.' "].) We thus agree with respondents that, under a literal reading of the statute, counties cannot satisfy section

11

54957.5, subdivision (b) merely by posting materials online. And we agree too that, if that is so, then accepting Sierra Watch's position may at times require counties to delay when they distribute materials to their board members.

But even so, we do not find that result so absurd that we must override the plain meaning of the statutory language requiring records to be "available for public inspection . . . at the time" they are distributed to the board. "To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them." (*In re D.B.* (2014) 58 Cal.4th 941, 948.) We cannot find so here. True, our literal reading of the statute may at times delay the distribution of materials to board members, occasionally leaving them with less time to consider late submissions. But the Legislature enacted section 54957.5, subdivision (b) in part because of the disparity of information available to the public and board members, with board members having access to agenda materials before the public. (See Assem. Com. on Local Gov., Analysis of Sen. Bill No. 343 (2007-2008 Reg. Sess.) p. 2 [noting the bill author's concern that "the last-minute release of agenda packet materials leaves citizens feeling blindsided by their governments"].) And its solution to this perceived problem was not to require counties to make these materials available to the public "without delay" after distribution to board members, as section 54957.5 requires in other circumstances. (See § 54957.5, subd. (a).) Its solution instead was to require counties to make these materials available to the public "at the time" they are distributed to board members. Considering this backdrop, it is at least plausible the Legislature thought it best that board members and the public have equal opportunity to review late submissions, even if achieving that requirement would on occasion result in less time for board members to review these submissions.

Respondents further assert that accepting Sierra Watch's position "would also lead to absurd results because it would allow opponents to perpetually delay project approval by submitting last minute comments outside of normal business hours." We appreciate

12

the concern. Suppose that in the middle of the night before every meeting, a member of the public e-mails all board members comments concerning an item on the board's agenda. Strictly construing section 54957.5, those e-mails arguably would need to "be made available for public inspection" at the county's office "at the time" they were sent to the board members. But it of course would be absurd to expect the county to remain open and staff its office to allow public inspection of documents in the middle of the night.[4]

     For that reason, respondents argue, their favored reading of the statute is the better one. But their approach fares no better in addressing this issue. Respondents, again, contend a county satisfies section 54957.5, subdivision (b) if, at the time a record is distributed to most or all board members, the county places a copy of that record in a location allowing for public inspection — even if the county does so at a time when that location is currently closed. But unless the county staffs its office around the clock, it cannot even accomplish that much when a member of the public e-mails the board in the middle of the night. And so, even under respondents' approach, this potential issue remains. So how should we deal with this situation? We need not decide this issue today, which unlike our case, concerns the conduct of those outside a county's control. For our purposes here, it is enough that we find the County violated section 54957.5 when, as a result of its own conduct, it failed to make the Schwab Memorandum available for public inspection at the time it distributed the memorandum to the Board.

---

[4]     As originally drafted, section 54957.5 required only the disclosure of records distributed to a local agency's legislative body "by a member, officer, employee, or agent of such body for discussion or consideration at a public meeting." (Stats. 1980, ch. 1284, § 24, pp. 4343-4344.) But in 1993, the Legislature expanded this language to require the disclosure of records distributed "by *any person* in connection with a matter subject to discussion or consideration at a public meeting" — language that remains the same today, with the exception of "a public meeting" now being "an open meeting." (Stats. 1993, ch. 1136, § 14, p. 6366, italics added; see § 54957.5, subd. (a).)

## II

### *The County's Amendment to the Development Agreement*

We consider next whether the County violated the Brown Act's requirements for posting agendas under section 54954.2.

The Brown Act requires counties, at least 72 hours before each meeting, to "post an agenda containing a brief general description of each item of business to be transacted or discussed at the meeting." (§ 54954.2, subd. (a)(1).) A county that fails to provide in its agenda the required "brief general description" of an item of business cannot discuss that item at the meeting, except in a few limited situations irrelevant here. (§ 54954.2, subds. (a)(3), (b).) And should it nonetheless do so, an interested person can seek declaratory and injunctive relief (§ 54960, subd. (a)) and also seek to nullify the county's action (§ 54960.1, subd. (a)). But interested persons cannot successfully nullify a county's action if the county at least substantially complied with section 54954.2's requirements. (§ 54960.1, subd. (d)(1).) Nor may they do so unless they suffered some prejudice from the county's action. (*Fowler v. City of Lafayette* (2020) 46 Cal.App.5th 360, 372.)

### A. *The County's Agenda Was Inaccurate and Misleading*

The County's agenda here, in relevant part, informed the public that the Board would consider approving a certain development agreement, which is a type of " 'enforceable contract between a municipality and a developer' " that, "[i]n essence, . . . 'freeze[s] zoning and other land use regulation applicable to specified property to guarantee that a developer will not be affected by changes in the standards for government approval during the period of development.' [Citation.]" (*Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 696-697; see § 65864 et seq.) In particular, the County's agenda noted that its Board would "consider a recommendation from the Placer County Planning

Commission" (the Planning Commission) to adopt "an ordinance to approve the Development Agreement relative to the Village at Squaw Valley Specific Plan."

According to Sierra Watch, however, the County's agenda ultimately proved to be "fatally misleading." Sierra Watch accepts that the agenda's reference to the "Development Agreement" would have allowed the approval of the development agreement that the County initially shared with the public at the time it posted its agenda. But, in Sierra Watch's view, the County acted improperly when it amended the agreement the night before the Board's meeting to add a requirement that Squaw pay $440,862 in air quality mitigation fees to TRPA. That is so, it reasons, because this fee requirement was effectively a "new type of approval" serving "to avoid a lawsuit by the Attorney General — a purpose entirely distinct from, and outside the scope of, the Development Agreement." And, it adds, even if this fee requirement were not a new type of approval distinct from the development agreement, the County's agenda was still "inadequate because the Development Agreement listed on it was substantially altered without notice, thereby misleading the public."

We address these arguments in turn, starting with Sierra Watch's contention that the TRPA fee requirement reflected a "new objective" and so was effectively a "new type of approval." The County required Squaw to pay various mitigation fees in the development agreement and perhaps, as Sierra Watch believes, it had somewhat different motives in imposing these different fees. Perhaps it required Squaw to pay some of these fees to address the County's concerns, and perhaps it required Squaw to pay the TRPA fee in part to address the Attorney General's concerns. But we reject Sierra Watch's contention that each provision in an agreement that addresses a distinct concern must necessarily be listed as a separate agenda item. Nothing in the Brown Act, in our view, imposes such a requirement. The Brown Act, again, requires a county's agenda to provide "a brief general description of each item of business to be transacted or discussed at the meeting." (§ 54954.2, subd. (a)(1).) And an agreement that includes, say, 10

15

distinct provisions to address the parties' various objectives on a topic is not, for that reason, 10 distinct "item[s] of business." It is instead one agreement and one "item of business." And so it is here: The development agreement for the project was, even as amended, one agreement and "one item of business."

Sierra Watch's two cited cases — *Hernandez v. Town of Apple Valley* (2017) 7 Cal.App.5th 194 (*Hernandez*) and *San Joaquin Raptor Rescue Center v. County of Merced* (2013) 216 Cal.App.4th 1167 (*San Joaquin Raptor*) — do not support a contrary finding. In *Hernandez*, a city council posted an agenda that discussed the potential approval of a "Wal-Mart Initiative Measure" but then, at its meeting, it approved more than just the initiative. It also approved a memorandum of understanding "that authorized accepting a gift from Walmart to pay for the" initiative process — something that "was first proposed at the meeting." (*Hernandez,* at pp. 197, 208.) The city council doing so, the court found, violated the Brown Act. It reasoned that section 54954.2 requires "each item of business" to be on the agenda, but the agenda in this case — which only referenced the "Wal-Mart Initiative Measure" — gave "no notice" of the separate and "important" item of business concerning the memorandum of understanding. (*Hernandez,* at pp. 208-209.)

The court's decision in *San Joaquin Raptor* is similar. The county there disclosed in its agenda that it would consider approving an application to subdivide three large parcels into nine parcels. (*San Joaquin Raptor*, *supra*, 216 Cal.App.4th at p. 1171.) But it then approved at its meeting the subdivision application *and* the CEQA document prepared for the project. The court found it violated section 54954.2 as a result. Similar to the court in *Hernandez*, the court reasoned that section 54954.2 requires "each item of business" to be on the agenda, but the agenda in this case — which only referenced the subdivision application — gave no notice of the "distinct item of business" concerning the CEQA document. (*San Joaquin Raptor,* at pp. 1176-1177; see also *Olson v.*

16

*Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 521 [agenda discussing the intent to approve nine specific bills did not authorize the approval of a tenth bill].)

Although Sierra Watch finds these cases "squarely on point here," we find differently. Unlike in *Hernandez* and *San Joaquin Raptor*, the County here noticed one development agreement in its agenda and the Board then approved one development agreement, not two distinct agreements, at its meeting. Sierra Watch, again, believes the approved development agreement is really two documents — a development agreement and a TRPA fee agreement — because its motive for adding the TRPA provision was "to avoid a lawsuit by the Attorney General." But again, we find that argument unpersuasive. To start, the premise that the County added the TRPA-fee provision "to avoid a lawsuit by the Attorney General" is questionable. As the trial court found, the County did not add that provision at the Attorney General's request. It instead added the provision, and apparently begrudgingly at that, because Squaw requested it. In any event, a contract that includes a provision to placate a third party, even if added late, is still only one contract and one "item of business."

That said, we acknowledge Sierra Watch's concern that local agencies may, in some instances, attempt to shoehorn new matters into existing agenda items to circumvent the Brown Act's requirements. But we reject its invitation to treat the TRPA fee in this case as an entirely new matter that was outside the scope of the development agreement. In arguing we should find otherwise, Sierra Watch claims that "the Board itself" characterized the TRPA provision as a " 'complete and separate issue' " from the development agreement, and so we should find the same. But we read the record differently. At the meeting, one Board member said it was not the County's policy to "concede" that TRPA had authority to impose fees on projects outside the Lake Tahoe Basin, and he then sought to confirm that the TRPA provision added here reflected, not the County's concession about TRPA's jurisdiction, but "a complete and separate issue related to the relationship between Squaw and [the Attorney General]." County counsel,

in response, confirmed that the provision was not a concession about TRPA's authority over the project but instead "a voluntary contribution on the part of [Squaw]." All this discussion, then, concerned only a desire to clarify the County's position concerning the scope of TRPA's authority — not the appropriate scope of a development agreement. Considering the context of this *one* Board member's "complete and separate issue" comment, we decline to find that "the Board itself" believed the TRPA concerned a matter "complete and separate" from the development agreement.

We turn next to Sierra Watch's second argument. Again, per Sierra Watch, even if the fee requirement were not a distinct agreement, the County's agenda would still be "inadequate because the Development Agreement listed on it was substantially altered without notice, thereby misleading the public." Unlike Sierra Watch's first argument, we find this one has merit.

The County's agenda, again, informed the public that the Board would "consider a recommendation from the Placer County Planning Commission" to adopt an ordinance approving "the Development Agreement relative to the Village at Squaw Valley Specific Plan." At the same time it shared the agenda, the County also shared a copy of the development agreement that the Planning Commission had recommended, which was titled "Development Agreement . . . relative to the Village at Squaw Valley Specific Plan." With these actions, the County plainly indicated that the development agreement that the Board would consider at its meeting would be the development agreement that the Planning Commission had recommended and that the County had publicly shared. But in the end, the Board never considered that particular agreement. It instead only considered (and then approved) a materially revised version of the development agreement that County staff, in consultation with Squaw and the Attorney General, had prepared the night before the Board's meeting. It, in other words, only considered a version of the agreement that the Planning Commission had never considered, even though the agenda indicated that the Board would consider the agreement that the

18

commission had actually considered.  We find the Board's agenda was, as a result of this change, rendered inaccurate and misleading.

Under similar circumstances, courts have found a government body's agenda improperly misleading.  Consider the California Supreme Court's decision in *Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315 (*Santa Barbara School District*).  That case concerned a statutory predecessor to the Brown Act that required governing boards of school districts to post, 48 hours before any public meeting, "[a] list of items that will constitute the agenda for" the meeting.  (*Santa Barbara School District,* at p. 333, fn. 8.)  The board there posted an agenda informing the public that "plans" for desegregating schools would be "[p]resent[ed] . . . to the Board" on one date and "a plan" would be "adopt[ed] . . . by the Board" at a later date.  In this language, the court found that the board indicated — even if it did not state outright — that the plan to be adopted by the board would be one of the plans presented to the board at its earlier meeting.  (*Id.* at p. 335.)  But in the end, the board adopted a plan that "differed radically" from any of the plans it had previously presented, leading the court to find the board's agenda "fatally misleading."  (*Id.* at pp. 335-336.)  According to the court, once the board indicated in its agenda that it would adopt one of the plans presented at its earlier meeting, "it thereby limited its power to consider any other substantially different plan since otherwise the posted agenda would be fatally misleading."  (*Id.* at p. 336.)

While the factual setting here is somewhat different, we find the error to be similar.  The Board, in its agenda, said it would consider a specific agreement at its meeting (namely, the development agreement that the Planning Commission had recommended), but in the end, the Board never once considered that agreement.  It instead only considered a materially different agreement (namely, the revised development agreement that Squaw staff prepared the night before the meeting), rendering the agenda inaccurate and misleading.

19

Respondents, in opposition, assert that the county code expressly allows the Board to " 'accept, modify, or disapprove' a draft Development Agreement recommended by the Planning Commission," and so, they suggest, the Board did not act improperly in acting consistent with this authority. (See Placer County Code, § 17.58.240, subd. B ["After the board of supervisors completes the public hearing, it may accept, modify, or disapprove the recommendation of the planning commission"].) But the Board did not, as respondents suppose, consider the Planning Commission's recommended agreement and then modify it to include the TRPA provision. The Board never modified anything. Nor, again, did it ever consider the particular agreement that the Planning Commission had recommended. It instead considered only the revised version of the agreement. And because the agenda indicated that the Board would consider the development agreement that the Planning Commission had recommended, and not instead consider only a materially revised agreement that the Planning Commission had never considered, we find the agenda was misleading as a result.

Respondents next, believing the analogy to *Santa Barbara School District* inapt, contend the alteration to the development agreement here was only a limited one — a "half-page 'insert' [that] did not change any other provisions in the" agreement. But the substance of the change, not the length of the new language, is what matters. And the addition of the TRPA fee here in the amount of $440,862, which was enough to address the Attorney General's significant concerns over the project, was a substantial alteration in our view. To emphasize the point, suppose circumstances were flipped and the County had removed a provision requiring the payment of nearly a half million dollars in fees as mitigation. Under those circumstances, we expect all would agree the change was a substantial one, even if excising that provision removed only half a page.

Respondents also challenge the idea that the Board's agenda indicated that any particular development agreement would be adopted. In their telling, the agenda never elaborated on the " 'specific provisions of a Development Agreement [that] would be

20

considered.' " We disagree. The County's agenda did not simply inform the public that its Board would consider approving some unspecified development agreement for the project. It did not, for example, say the Board would consider approving "*a* development agreement" for the project. It instead said the Board would consider approving "*the* Development Agreement relative to the Village at Squaw Valley Specific Plan" — which was the title of the development agreement that the Planning Commission had recommended. Any reasonable reader of this messaging would understand that the development agreement the Board would consider at its meeting would be the development agreement the Planning Commission had recommended.

Respondents next contend *Santa Barbara School District* is distinguishable by its own terms. To that end, they cite a portion of the opinion stating that "if the agenda had simply indicated the adoption of a 'Desegregation/Integration Plan for the Elementary District,' we would entertain no doubt that it would have given adequate notice." (*Santa Barbara School District*, *supra*, 13 Cal.3d at p. 335.) But had the school board there said only that, it would not have been suggesting that the board would consider approving any particular type of plan — and that is not something we can say here. Again, the County did not merely inform the public that its Board would consider an unspecified development agreement for the project. It instead indicated that the Board would consider the development agreement that the Planning Commission had recommended. But again, the Board never considered that particular version of the agreement.

Respondents further assert that "nothing in the Brown Act prohibits changes to agenda items . . . between the posting of the agenda and the ultimate agency action." But even if that is generally true, a county's agenda still needs to be accurate; and an agenda is not accurate if it says a county's board of supervisors will consider one agreement at its meeting but then, at the meeting, the board instead considers a materially different agreement. Perhaps, had the Board here considered the development agreement the Planning Commission had recommended and then acted itself to modify the agreement to

include the TRPA provision, we would have ruled differently. Perhaps, under those circumstances, we would have agreed that "nothing in the Brown Act prohibits changes to agenda items . . . between the posting of the agenda and the ultimate agency action." But those are not the facts before us. And focusing on the facts presented, we conclude that the Board could not, in its agenda, say it would consider a particular development agreement at its upcoming meeting, and then, at its meeting, consider only a materially different agreement rather than the one it promised.

Finally, respondents express concern that accepting Sierra Watch's argument would make counties and other local agencies unable to respond to late comments. In their view, "[i]f a local agency could not make changes to a proposed project in response to public or other agency concerns (as the Board did here) without violating the Brown Act, public comments received in the three or more days between the posting of the agenda and the agency's decision would be for naught." But our holding does not, as respondents imagine, bar a county's board from making changes to a proposed project in response to comments received after an agenda is posted. It has little to do with that topic. The Board here, after all, never even made changes to any proposed project — though respondents repeatedly try to characterize the record differently. Again, the County's agenda indicated that the Board would consider approving the development agreement that the Planning Commission had recommended. But, because of a last minute revision to the agreement, the Board never considered that particular agreement. The Board never, that is, considered the specific agreement that the agenda said it would consider. It instead only considered a substantially revised development agreement, leaving the posted agenda inaccurate and misleading.

B. *Sierra Watch Has Not Shown Prejudice*

Our conclusion that the County violated section 54954.2 does not end the matter. Because Sierra Watch seeks to nullify the Board's approval of the development agreement, it is not enough that the County violated section 54954.2. Sierra Watch,

again, cannot nullify the Board's approval of the agreement if the County at least "substantial[ly] compli[ed]" with section 54954.2's requirements. (§ 54960.1, subd. (d)(1).) Nor may Sierra Watch nullify the Board's approval unless it suffered prejudice as a result. (*Fowler v. City of Lafayette*, *supra*, 46 Cal.App.5th at p. 372.)

We start (and end) with the need to show prejudice. To make this showing, Sierra Watch first asserts that, if it had more time to review the TRPA provision, it would have sought expert advice and then provided comments to the Board. But the County's violation of section 54954.2 was not the cause of Sierra Watch's limited ability to review the TRPA provision. The Board's agenda violated that statute, again, because it misled the public about the particular development agreement to be considered at the Board's meeting — something that could have been avoided had the agenda simply clarified that the development agreement the Board would consider at its meeting would not necessarily be the development agreement the Planning Commission had recommended. (See *Santa Barbara School District*, *supra*, 13 Cal.3d at p. 335 ["if the agenda had simply indicated the adoption of a 'Desegregation/Integration Plan for the Elementary District,' " rather than indicating the adoption of one of the plans presented at an earlier meeting, "we would entertain no doubt that it would have given adequate notice"].) But had the agenda clarified that point, and thus avoided the violation of section 54954.2, Sierra Watch still would not have been aware of the TRPA provision until the day of the meeting. Nor, considering Sierra Watch's allegations, can we say that Sierra Watch would have acted differently or been better positioned had the agenda clarified this point. Sierra Watch's alleged harm, thus, cannot be attributed to the County's violation of section 54954.2.

Sierra Watch also, to show prejudice, contends the Attorney General's agreement not to sue in light of the TRPA provision "conceivabl[y] . . . influenced the Board's decision." But in evaluating allegations of prejudice under the Brown Act, we do not consider whether the agency's ultimate decision could have "conceivabl[y]" been

23

different had the law been followed. We consider instead whether the agency's failure to comply with the law undermined the purposes of the Brown Act by depriving the public of a fair opportunity to participate in the agency's open meetings. (See *Galbiso v. Orosi Public Utility Dist.* (2010) 182 Cal.App.4th 652, 671 [finding a plaintiff was not prejudiced by an agency's alleged violation of the Brown Act because the plaintiff already had a fair opportunity to state her position]; cf. *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1023 [declining, in a CEQA case, to conclude that a party alleging prejudice must "show[] the result would have been different in the absence of the error"; the party instead must show the "failure to comply with the law result[ed] in a subversion of the purposes of CEQA by omitting information from the environmental review process"].) And on that topic, Sierra Watch only alleges that, had it known of the TRPA provision earlier, it would have sought expert advice and then submitted comments to the Board. But again, the unlawful conduct it alleges (the posting of a misleading agenda) did not cause the harm it alleges (the limited ability to review the TRPA provision).[5]

Because, in sum, Sierra Watch has failed to show that the County's violation of section 54954.2 deprived it of a fair opportunity to participate in the County's meeting,

---

[5] Sierra Watch bases its conceivably-different-outcome argument on *Hernandez*. In its view, *Hernandez* said a Brown Act violation is prejudicial so long as it was conceivably "a factor" in the agency's decision. But the *Hernandez* court said no such thing. The court instead appeared to find prejudice because the Brown Act violation before it — which concerned a city council's approval of an agreement that was not on its agenda — deprived the plaintiff of a fair opportunity to share his views on the agreement. (See *Hernandez*, *supra*, 7 Cal.App.5th at pp. 204-205 [noting that, had the agenda described the agreement, the plaintiff would have attended the meeting to express his " 'serious concerns' "], 208 [noting that no one at the meeting expressed the plaintiff's concerns or even commented on the agreement].) The court then separately noted that the city's conduct was, apart from being prejudicial, also "troublesome as it is conceivable this [violation] was a major factor" in the council's approval of a related project. (*Id.* at p. 208.)

24

we decline to find that nullification of the County's action is proper. The County's conduct, we acknowledge, led to the late disclosure of the TRPA provision, which in turn led to Sierra Watch's alleged harm in having too little time to review this provision. But again, that alleged harm was unrelated to the County's violation of section 54954.2. Nothing in section 54954.2, after all, required the County to disclose the specific terms of the development agreement at the time the agenda was posted. (See § 54954.2 [requiring only a "brief general description of each item of business," which "generally need not exceed 20 words"].) And so even had the Board's agenda complied with section 54954.2, Sierra Watch still would have been unaware of the TRPA provision. That said, we do not deny that Sierra Watch suffered some prejudice through the late disclosure of the TRPA provision. But that prejudice, if anything, resulted from the County's violation of section 54957.5; and as we discussed in part I of our opinion, the County's violation of that statute, even if prejudicial, does not provide ground for vacating the County's action.

DISPOSITION

The judgment is affirmed to the extent that it denies Sierra Watch's petition to set aside the County's action and is otherwise reversed. The trial court is instructed to enter a new judgment granting Sierra Watch's writ petition, including its request for declaratory and injunctive relief, in a manner consistent with this opinion. The parties are to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278.)


        /s/
        BLEASE, J.


I concur:


 /s/
DUARTE, J.

25

RAYE, P. J., concurring.

This case presents two issues of statutory construction concerning the obligation of a county board of supervisors under the Ralph M. Brown Act (Gov. Code, § 54950 et. seq.)[6] to make certain information available to the public in advance of a meeting to which the information relates.

Section 54954.2, subdivision (a)(1) requires a board to post an agenda at least 72 hours before each board meeting "containing a brief general description of each item of business to be transacted or discussed at the meeting."

Section 54957.5, subdivision (b)(1) requires county board of supervisors, when distributing any meeting material to their boards less than 72 hours before an open meeting, to make that writing "available for public inspection . . . at the time the writing is distributed to all, or a majority of all, of the [board members]."

As to section 54957.5, subdivision (b), concerning the availability of meeting materials distributed to board members less than 72 hours before an open meeting, I agree with the majority opinion's conclusion that (1) materials placed in a public office after the close of business are not "available for public inspection" until the office reopens, and (2) the statute does not authorize online posting as an alternative method of providing public access. Consequently the materials at issue here, a provision requiring Squaw Valley Real Estate LLC to pay $440,862 in fees to be used for Tahoe Regional Planning Agency (TRPA) "Environmental Improvement Projects," delivered to a public office after closing hours, were not available for public inspection until the following day, thus missing the 72-hour posting deadline.

---

**6** Undesignated statutory references are to the Government Code.

1

However, I am not persuaded by the majority opinion's construction of section 54954.2, subdivision (a)(1) and its conclusion that the agenda posted by board did not comport with the statute.

In language about as clear as one can make it, the statute simply requires the agenda to contain "a brief general description of each item of business to be transacted or discussed." (§ 54954.2, subd. (a)(1).) The agenda here informed the public that the board would "consider a recommendation from the Placer County Planning Commission" to adopt an ordinance approving "the Development Agreement relative to the Village at Squaw Valley Specific Plan." At the same time it shared the agenda, the county also shared with the public a copy of the development agreement that the planning commission had recommended, which was titled "Development Agreement . . . relative to the Village at Squaw Valley Specific Plan."

The majority opinion wisely rejects Sierra Watch's contention that each provision in an agreement that addresses a distinct concern must necessarily be listed as a separate agenda item. The development agreement for the project was, even as amended, one agreement and one "item of business." (§ 54954.2, subd. (a)(1).)

The majority opinion also rejects the invitation to treat the TRPA fee in this case as an entirely new matter that was outside the scope of the development agreement.

But the majority opinion accepts the argument that "the Development Agreement listed on it was substantially altered without notice, thereby misleading the public." The majority opinion reasons that the development agreement referred to in the agenda was the development agreement described in documents provided to board in advance of the meeting—the documents that were not made "available for public inspection" as required by section 54957.5, subdivision (b). The majority opinion likens this to facts considered in *Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315 (*Santa Barbara School District*) where "the board indicated—even if it did not state outright—that the plan to be adopted by the board would be one of the plans presented to the board at its

2

earlier meeting. (*Id.* at p. 335.) But in the end, the board adopted a plan that 'differed radically' from any of the plans it had previously presented, leading the court to find the board's agenda 'fatally misleading.' " (Maj. opn *ante*, at p. 19.)

But this case is not like the bait and switch of the *Santa Barbara School District* case. The agenda did not indicate the board would "consider the recommendation from the Placer County Planning Commission set forth in the materials furnished to the Board" on a specified date. The development agreement the board considered and approved was the agreement the planning commission recommended, as amended to address the Attorney General's opposition. The amendment led the Attorney General to drop his opposition and smoothed the path to approval of the agreement recommended by the planning commission.

Even with the amendment the development agreement fit the "general description" set forth in the agenda. Perhaps if we treated agendas like pleadings we could assert there was a material variance but agendas are not that. If the public was misled, it was not because of the agenda but because the materials made available to them in advance of the meeting were incomplete and did not accurately describe the plan. It was the board's violation of section 54957.5, subdivision (b) and not the violation of section 54954.2, subdivision (a)(1) that created the problem complained of in the majority opinion.

Still, I agree there is no basis for setting aside the board's action. So I concur in the result.

_____/s/_____<br>
RAYE, P. J.

3

Filed 9/21/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SIERRA WATCH, | C087892 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0038917) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| SQUAW VALLEY REAL ESTATE, LLC, et al., | |
| Real Parties in Interest and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed August 24, 2021, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

_____

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II the Discussion and the concurring opinion.

1

# EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Placer County, Michael W. Jones, Judge. Reversed.

Shute, Mihaly & Weinberger, Amy J. Bricker, Robert S. Perlmutter and Laura D. Beaton for Plaintiff and Appellant.

Office of the Placer County Counsel and Clayton T. Cook for Defendants and Respondents Placer County and Placer County Board of Supervisors.

Remy Moose Manley, Whitman F. Manley, Howard F. Wilkins III and Nathan O. George for Real Parties in Interest and Respondents Squaw Valley Real Estate, LLC, and Squaw Valley Resort, LLC.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
DUARTE, J.